ALLENBERG COTTON CO., INC. *v.* PITTMAN

No. 73–628.   Argued October 17, 1974—Decided November 19, 1974

DOUGLAS, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, STEWART, WHITE, MARSHALL, BLACKMUN, and

Powell, JJ., joined. Rehnquist, J., filed a dissenting opinion, *post*, p. 34.

*John McQuiston II* argued the cause and filed briefs for appellant.

*George Colvin Cochran* argued the cause for appellee. With him on the brief were *C. "Cliff" Finch* and *Anna C. Maddan.**

Mr. Justice Douglas delivered the opinion of the Court.

This is an appeal from a judgment of the Supreme Court of Mississippi, 276 So. 2d 678 (1973), which held that under the applicable Mississippi statute [1] appellant might not recover damages for breach of a contract to deliver cotton because of its failure to qualify to do business in the State. Appellant claims that that Mississippi statute as applied to the facts of this case is repugnant to the Commerce Clause of the Constitution. A motion to dismiss was made on the ground that the Mississippi Supreme Court did not pass on that federal question and that such question was not in fact raised. We accordingly postponed the question of probable jurisdiction to a hearing on the merits, 415 U. S. 988 (1974).

---

*\*James F. Blumstein* filed a brief for the American Cotton Shippers Assn. as *amicus curiae*.

[1] Mississippi Code Ann. § 79–3–247 (1972), formerly Miss. Code Ann. § 5309–239 (1942), provides in part:

"No foreign corporation transacting business in this state without a certificate of authority shall be permitted to maintain any action, suit or proceeding in any court of this state. Nor shall any action, suit or proceeding be maintained in any court of this state by any successor or assignee of such corporation on any right, claim or demand arising out of the transaction of business by such corporation in this state."

22

I

On application of appellant (appellee below), the Chief Justice of the Supreme Court of Mississippi executed a certificate dated August 17, 1973, stating in part:

"[T]his Court . . . hereby certifies . . . that in this appeal . . . and in the arguments both oral and by brief made in this Court on behalf of the appellee on the original appeal and the petition of appellee for rehearing and brief filed in support thereof, it was insisted by appellee that under the facts of this case, the contract sued upon by the appellee was made in 'interstate commerce' and that it was transacting business in interstate commerce, and thus entitled to protection as such under the applicable statutes of Mississippi and the Commerce Clause of the Federal Constitution; and that in its deliberation of this case, this Court both on the original appeal and the petition for rehearing considered these questions of interstate commerce; and it was the judgment of this Court that said contract was not made in interstate commerce, nor that the facts of the case showed appellee to be transacting business in interstate commerce within the meaning of the laws of Mississippi and that Mississippi Code 1942 Ann. Section 5309–239 (Supp. 1972) as applied by this Court in this case to the Allenberg Cotton Company, Inc., a Tennessee corporation, to bar it from maintaining suit in the courts of this state was not repugnant to the Commerce Clause of the United States Constitution; and it was necessary to the Court's judgment in said case to determine said questions raised as to interstate commerce, and that such questions were determined adversely to the position of appellee."

The Chief Justice, speaking for the court, makes it clear that a federal question was raised and decided and that that question was the validity of the state statute as applied to the facts of this case under the Commerce Clause of the Federal Constitution. That certificate is adequate under our decisions.[2] So we proceed to the merits.

## II

Appellant is a cotton merchant with its principal office in Memphis, Tenn. It had arranged with one Covington, a local cotton buyer in Marks, Miss., "to contract cotton" to be produced the following season by farmers in Quitman County, Miss. The farmer, Pittman, in the present case, made the initial approach to Covington, seeking a contract for his cotton; in other

---

[2] See *International Steel & Iron Co.* v. *National Surety Co.,* 297 U. S. 657, 661–662 (1936). As stated in *Herb* v. *Pitcairn,* 324 U. S. 117, 127 (1945):

"The practice has become common by which some state courts, such as the New York Court of Appeals, provide counsel on motion with a certificate of the court or of the Chief Judge that a stated federal question was presented and necessarily passed upon if such was the case. See, *e. g.,* cases cited in Robertson and Kirkham, Jurisdiction of the Supreme Court, § 75."

In *Whitney* v. *California,* 274 U. S. 357, 360–362 (1927), while the record did not show that the party raised or that the state court considered "any Federal question whatever," a supplemental order entered by the state court after the case had reached this Court, setting forth the federal question raised and decided by the state court, was given the same effect "as would be done if the statement had been made in the opinion of that court when delivered."

In cases where the certificate (*Honeyman* v. *Hanan,* 300 U. S. 14 (1937)) or supplemental opinion by one member of the state court (*Charleston Federal Savings & Loan Assn.* v. *Alderson,* 324 U. S. 182 (1945)) has been held to be insufficient, there were lingering doubts as to whether the precise federal question was necessarily decided. Here we have no remaining doubts.

instances Covington might contact the local farmers.[3] In either event, Covington would obtain all the information necessary for a purchase contract and telephone the information to appellant in Memphis, where a contract would be prepared, signed by an officer of appellant, and forwarded to Covington. The latter would then have the farmer sign the contract. For these services Covington received a commission on each bale of cotton delivered to appellant's account at the local warehouse.[4] When the farmers delivered the cotton, Covington would draw on appellant and pay them the agreed price.

The Supreme Court of Mississippi held that appellant's transactions with Mississippi farmers were wholly intrastate in nature, being completed upon delivery of the cotton at the warehouse, and that the fact that appellant might subsequently sell the cotton in interstate commerce was irrelevant to the federal question "as the Mississippi transaction had been completed and the cotton then belonged exclusively to Allenberg, to be disposed of as it saw fit, at its sole election and discretion," 276 So. 2d, at 681. Under the contract which Covington negotiated with appellee, Pittman, the latter was to plant, cultivate, and harvest a crop of cotton on his land, deliver it to a named company in Marks, Miss., for ginning, and then turn over the ginned cotton to appellant at a local warehouse. The suit brought by appellant alleged a refusal of Pittman to deliver the cotton and asked for injunctive relief and damages. One defense tendered by Pittman was that appellant could not use the courts of Mississippi to enforce its contracts, as it was doing business in the State without the requisite certificate. The Supreme Court of Mississippi sustained that

---

[3] The latter practice seems to have been the more usual one. (App. 54, 102–105.)

[4] The commission was paid in some instances by appellant, in other instances by the individual farmer. (*Id.*, at 53, 68.)

plea, reversing a judgment in favor of appellant, and dismissed the complaint.

Appellant's arrangements with Pittman and the broker, Covington, are representative of a course of dealing with many farmers whose cotton, once sold to appellant, enters a long interstate pipeline. That pipeline ultimately terminates at mills across the country or indeed around the world, after a complex sorting and matching process designed to provide each mill with the particular grade of cotton which the mill is equipped to process.

Due to differences in soil, time of planting, harvesting, weather, and the like, each bale of cotton, even though produced on the same farm, may have a different quality.[5] Traders or merchants like appellant, with the assistance of the Department of Agriculture, must sample each bale and classify it according to grade, staple length, and color.[6] Similar bales, whether from different farms or even from different collection points, are then grouped in multiples of 100 into "even-running lots" which are uniform as to all measurable characteristics. This grouping process typically takes place in card files in the merchant's office; when enough bales have been pooled to make an even-running lot, the entire lot can be targeted for a mill equipped to handle cotton of that particular quality, and the individual bales in the lot will then be shipped to the mill from their respective collection points.[7] It is true that title often formally passes to

---

[5] A. B. Cox, Cotton—Demand, Supply, Merchandising 4–5 (1953); A. Garside, Cotton Goes to Market 66–67 (1935).

[6] For a more detailed description of the classification process, see Cox, *supra*, n. 5, at 131–147; Garside, *supra*, n. 5, at 46–85.

[7] See Cox, *supra*, n. 5, at 4–5, 233–236. Virtually all cotton grown in Mississippi is shipped out of state, since there is no significant milling activity in Mississippi. U. S. Dept. of Agriculture (USDA), Statistical Bulletin No. 417—Statistics on Cotton and Related Data, 1930–1967, pp. 58, 77 (Supp. 1972).

the merchant upon delivery of the cotton at the warehouse, and that the cotton may rest at the warehouse pending completion of the classification and grouping processes; but, as the description above indicates, these fleeting events are an integral first step in a vast system of distribution of cotton in interstate commerce.

The contract entered into between appellant and Pittman was a standard "forward" contract, executed in January 1971 and covering the crop to be grown that year. Such contracts have become common in the American cotton-marketing system; they provide a ready way for the cotton farmer to protect himself against a price decline by ensuring that he will be able to sell his crop at a sufficient price to cover his expenses.[8] The merchant who has contracted to buy the cotton from the farmer must in turn protect himself against market fluctuations. In this case, appellant had entered into contracts for sale of cotton to customers outside Mississippi,[9] in quantities approximating the expected yield of the Pittman contract and appellant's other Mississippi contracts. A resale contract of this sort ensures that the merchant will be able to cover his own expenses and recoup a small profit; alternatively, the merchant may

---

[8] See *Cone Mills Corp.* v. *Hurdle,* 369 F. Supp. 426, 430 (ND Miss. 1974); Cox, *supra,* n. 5, at 10. Government figures showed 32% of the 1972 crop and at least 45% of the 1973 crop being "forward" contracted. USDA, August 1973 Crop Production A-6; USDA, Cotton Situation (CS-265) p. 6 (Apr. 1974). Of course, there is always the possibility that the price will increase rather than decrease; such in fact was the case during 1971. Under these circumstances, the forward contract becomes relatively unprofitable, since the farmer is obligated to deliver his cotton for a lower price than it would bring on the spot market. This situation may generate a strong economic incentive for him to breach his contract and sell the cotton elsewhere.

[9] App. 79, 96. Cf. n. 7, *supra.*

protect himself by "hedging," *i. e.*, offsetting his purchases with a sale of futures contracts on the cotton exchange.[10] The stability of the position he has constructed for himself, however, clearly depends on the integrity and enforceability of his contracts for purchase and resale.[11]

A recent House report on the functioning of the commodity exchanges in connection with the marketing of agricultural products said:

> "The commodity futures markets are a very important part of our marketing system. Producers, processors, and merchandisers of commodities hedge the prices at which they buy or sell on a particular day. When the local elevator buys grain from a farmer he sells the same quantity on the futures market deliverable at about the same time he anticipates sale of the cash grain he has purchased. When the actual sale is made, he 'lifts' his hedge by buying the same quantity on the futures market in the same futures month he previously sold in. If the price of grain on the cash market fluctuates either up or down, the gain or

---

[10] The New York Cotton Exchange is a designated contract market under the Commodity Exchange Act, 42 Stat. 998, 49 Stat. 1491, 7 U. S. C. § 1 *et seq.* For a more detailed discussion of the hedging mechanism, see Cox, *supra,* n. 5, at 303–315; Garside, *supra,* n. 5, at 206–226, 377–382; *Volkart Bros., Inc.* v. *Freeman,* 311 F. 2d 52, 54–56 (CA5 1962); and see the discussion of the wheat futures market quoted in the text, this page and 28–29.

[11] The merchant's ability to secure financing will also depend on the extent to which banks and other sources of credit perceive these contracts as being reliable. In some situations, up to 90% of the cost of the raw cotton may be financed by borrowing against futures contracts and warehouse receipts as collateral, since a viable hedging system drastically reduces the risk to both merchants and lenders. See Cox, *supra,* n. 5, at 181.

loss should be approximately offset by the hedged position.

.    .    .    .    .

". . . [I]n this situation if the market price of the cash commodity drops 15 cents per bushel between the time the elevator operator purchases the grain and the time he resells it 6 months later, he would incur a loss of $1,500 on each 10,000 bushels. If, however, at the time he purchased the grain from the farmer he had sold the same amount of grain on the futures market in a contract which matured 6 months later, the futures price should also decrease a similar 15 cents per bushel and the elevator operator would profit $1,500 on each 10,000 bushels he sold on the futures market. The net effect, of course, of these offsetting purchases and sales would be to guard the elevator operator against loss, thereby permitting him to continue in business without regard to price fluctuation, providing the futures market operates in the normal historical manner.

"Such use of the futures market by a producer, buyer, or seller of the commodity takes the gamble of commodity price fluctuation out of his operation for him and enables him to lock in a relatively small margin of profit. This system has worked well most of the time, but whenever the supplies of commodities are short or the number of speculators becomes excessive, there exist opportunities for manipulations and distortions in the marketing system to such a great extent that the market no longer reflects supply and demand, and during part of the marketing season, prices can either be artificially raised or lowered.

"In the past year, fluctuations in the market have been so wide and erratic as to indicate the possibility of price manipulation and squeezing. Businessmen

who handle commodities on some occasions have been unable to buy back contracts the day they sell the commodity and many of them have found that the commodities markets such as the Chicago Board of Trade and the Chicago Mercantile Exchange do not always provide a dependable place to hedge their business deals. With the compromising of this kind of price insurance, many businessmen who handle commodities have felt compelled to substantially increase the amount they charge for their part in the marketing system and some have lost vast sums of money. Some now feel compelled to triple or quadruple the normal margin to cover new risks or to act only on a commission basis.

"Consumers are also greatly affected by any breakdown in our marketing system. When the futures markets are manipulated or become undependable, wider margins required at each level add to the price of the final product. Historically, erratic swings in prices result in retail prices going up more than they ever come back down. So consumers also have a great stake in preventing excessive speculation or manipulation from causing wide fluctuations in commodity prices." H. R. Rep. No. 93–963, pp. 2–4 (1974).

While that discussion covers grain, there is no essential difference, relevant here, when it comes to cotton.

We deal here with a species of control over an intricate interstate marketing mechanism. The cotton exchange, like the livestock-marketing regime involved in *Swift & Co.* v. *United States*, 196 U. S. 375 (1905), and in *Stafford* v. *Wallace,* 258 U. S. 495 (1922), has federal protection under the Commerce Clause. In *Dahnke-Walker Milling Co.* v. *Bondurant,* 257 U. S. 282 (1921), wheat raised in Kentucky was purchased by a miller in Tennessee,

payment and delivery to a common carrier being made in Kentucky. There, as here, a suit against the farmer in a Kentucky court was defended on the grounds that the buyer had not qualified to do business in Kentucky and that, therefore, the contract was unenforceable. The Court held that the Kentucky statute could not be applied to defeat this transaction which, though having intrastate aspects, was in fact "a part of interstate commerce," *id.,* at 292. The same observation is pertinent here. Delivery of the cotton to a warehouse, taken in isolation, is an intrastate transaction. But that delivery is also essential for the completion of the interstate transaction, for sorting and classification in the warehouse are essential before the precise interstate destination of the cotton, whether in this country or abroad, is determined. The determination of the precise market cannot indeed be made until the classification is made. The cotton in this Mississippi sale, like the wheat involved in *Chicago Board of Trade* v. *Olsen,* 262 U. S. 1, 33 (1923), though temporarily in a warehouse, was still in the stream of interstate commerce. As the Court stated in the *Olsen* case:

> "The fact that the grain shipped from the west and taken from the cars may have been stored in warehouses and mixed with other grain, so that the owner receives other grain when presenting his receipt for continuing the shipment, does not take away from the interstate character of the through shipment any more than a mixture of the oil or gas in the pipe lines of the oil and gas companies in West Virginia, with the right in the owners to withdraw their shares before crossing state lines, prevented the great bulk of the oil and gas which did thereafter cross state lines from being a stream or current of interstate commerce." *Id.,* at 33–34.

The Court held in *Shafer* v. *Farmers Grain Co.*, 268 U. S. 189 (1925), that a pervasive state regulatory scheme governing the purchase of wheat for interstate shipment was not permissible, since the "[b]uying for shipment" was "as much a part of [interstate commerce] as the shipping." *Id.*, at 198. And it added:

"Wheat—both with and without dockage—is a legitimate article of commerce and the subject of dealings that are nation-wide. The right to buy it for shipment, and to ship it, in interstate commerce is not a privilege derived from state laws and which they may fetter with conditions, but is a common right, the regulation of which is committed to Congress and denied to the States by the commerce clause of the Constitution." *Id.*, at 198–199 (footnote omitted).

In *Hood & Sons* v. *Du Mond*, 336 U. S. 525 (1949), we held that a State might not deny a license to a milk distributor serving the interstate market on the ground that the new facilities would reduce the supply of milk for local markets. In expressing the philosophy of the Commerce Clause to federalize the regulation of interstate and foreign commerce, we said:

"The Commerce Clause is one of the most prolific sources of national power and an equally prolific source of conflict with legislation of the state. While the Constitution vests in Congress the power to regulate commerce among the states, it does not say what the states may or may not do in the absence of congressional action, nor how to draw the line between what is and what is not commerce among the states. Perhaps even more than by interpretation of its written word, this Court has advanced the solidarity and prosperity of this Nation by the mean-

ing it has given to these great silences of the Constitution." *Id.*, at 534–535.

And we added:

> "Our system, fostered by the Commerce Clause, is that every farmer and every craftsman shall be encouraged to produce by the certainty that he will have free access to every market in the Nation, that no home embargoes will withhold ·his exports, and no foreign state will by customs duties or regulations exclude them.   Likewise, every consumer may look to the free competition from every producing area in the Nation to protect him from exploitation by any.   Such was the vision of the Founders; such ·has been the doctrine of this Court which has given it reality." *Id.*, at 539.

Much reliance is placed on *Eli Lilly & Co.* v. *Sav-On-Drugs, Inc.*, 366 U. S. 276 (1961), for sustaining Mississippi's action.   The case is not in point.   There the Court found that the foreign corporation had an office and salesmen in New Jersey selling drugs intrastate. Since it was engaged in an intrastate business it could be required to obtain a license even though it also did an interstate business.

Reliance is also placed on *Union Brokerage Co.* v. *Jensen,* 322 U. S. 202 (1944), which is likewise not in point.   It is true that the customhouse broker in that case was in the business of dealing with goods in interstate transit.   Nevertheless, we expressly noted that "[the broker's] activities are not confined to its services at the port of entry.   It has localized its business, and to function effectively it must have a wide variety of dealings with the people in the community." *Id.*, at 210. As in *Eli Lilly,* this element of localization was held to be distinguishable from cases such as *Dahnke-Walker* in which a foreign corporation enters the State "to con-

tribute to or to conclude a unitary interstate transaction." *Id.*, at 211. In this respect we have found appellant's transactions, when viewed against the background of customary trade practices in the cotton market, to be indistinguishable from the activities in *Dahnke-Walker* in any significant regard.

The Mississippi Supreme Court, as noted, ruled that appellant was doing business in Mississippi. Appellant, however, has no office in Mississippi, nor does it own or operate a warehouse there. It has no employees soliciting business in Mississippi or otherwise operating there on a regular basis;[12] its contracts are arranged through an independent broker, whose commission is paid either by appellant or by the farmer himself and who has no authority to enter into contracts on behalf of appellant.[13] These facts are in sharp contrast to the situation in *Eli Lilly*, where Lilly operated a New Jersey office with 18 salaried employees whose job was to promote use of Lilly's products. 366 U. S., at 279–281. There is no indication that the cotton which makes up appellant's "perpetual inventory" in Mississippi is anything other than what appellant has claimed it to be, namely, cotton which is awaiting necessary sorting and classification as a prerequisite to its shipment in interstate commerce.

In short, appellant's contacts with Mississippi do not exhibit the sort of localization or intrastate character which we have required in situations where a State seeks to require a foreign corporation to qualify to do business. Whether there were local tax incidents of those contacts which could be reached is a different question on which

---

[12] One of appellant's Memphis employees, Jerry Hill, came to Mississippi on two or three occasions to deliver contracts to the broker, Covington. The more usual practice, however, appears to have been for the contracts to be mailed. (App. 56–57, 66–67, 72–76.)

[13] *Id.*, at 60–61, 65–66, 106–107. See also n. 4, *supra.*

we express no opinion. Whether the course of dealing would subject appellant to suits in Mississippi is likewise a different question on which we express no view. We hold only that Mississippi's refusal to honor and enforce contracts made for interstate or foreign commerce is repugnant to the Commerce Clause.

The judgment is reversed and the cause remanded for proceedings not inconsistent with this opinion.

*So ordered.*

MR. JUSTICE REHNQUIST, dissenting.

The question in this case is whether Mississippi may require appellant, a Tennessee corporation, to qualify as a foreign corporation under Mississippi law before it may sue in the courts of Mississippi to enforce a contract. The Supreme Court of Mississippi summarized the facts of the transaction, which it stated were "without substantial dispute," as follows:

> "It is apparent that these transactions of Allenberg in each case, including that with Pittman, took place wholly in Mississippi. The contract was negotiated in Mississippi, executed in Mississippi, the cotton was produced in Mississippi, delivered to Allenberg at the warehouse in Mississippi, and payment was made to the producer in Mississippi. All interest of the producer in the cotton terminated finally upon delivery to Allenberg at the warehouse in Marks. The fact that afterward Allenberg might or might not sell the cotton in interstate commerce is irrelevant to the issue here, as the Mississippi transaction had been completed and the cotton then belonged exclusively to Allenberg . . . ." 276 So. 2d 678, 681 (1973).

The Supreme Court of Mississippi might have added that through an exclusive agent, who was a Mississippi

resident, Allenberg entered into over 20 similar contracts in 1971 with farmers in Quitman County alone, contracts covering cotton production from over 9,000 acres in this one county. Allenberg's total 1971 purchases of cotton grown in Mississippi under substantially identical contracts exceeded 25,000 bales. When cotton grown under these contracts arrived at Mississippi warehouses designated by Allenberg the cotton was compressed and sorted by warehousemen acting at Allenberg's direction. It was then stored at the warehouse as a part of a perpetual revolving inventory of cotton, maintained by Allenberg at cotton concentration points throughout Mississippi to await future shipping orders.[1]

For reasons which are not entirely clear to me, the Court holds that Mississippi may not require Allenberg to qualify as a foreign corporation as a condition of using Mississippi courts to enforce its contract with appellee Pittman.[2]

The Court says that "[d]elivery of the cotton to a warehouse, taken in isolation, is an intrastate transaction. But that delivery is also essential for the completion of the interstate transaction, for sorting and classification in the warehouse are essential before the precise interstate destination of the cotton, whether in this country or abroad, is determined." *Ante,* at 30. Yet in *Parker v. Brown,* 317 U. S. 341, 361 (1943), this Court stated

---

[1] App. 92; Brief for Appellant 11. The record does not disclose the turnover time of the inventory but this is not material in light of Allenberg's admission that it maintains *perpetual* inventories in Mississippi.

[2] In its concluding paragraph the Court states: "We hold only that Mississippi's refusal to honor and enforce contracts made for interstate or foreign commerce is repugnant to the Commerce Clause." The Court offers no definition or analysis as to why this particular contract was "made for interstate or foreign commerce," and the language is traceable to none of our previous cases dealing with the Commerce Clause.

that "no case has gone so far as to hold that a state could not license or otherwise regulate the sale of articles within the state because the buyer, after processing and packing them, will, in the normal course of business, sell and ship them in interstate commerce." But putting aside such uncertainties engendered by the Court's language, its holding seems to me quite inconsistent with our previous cases applying the Commerce Clause to this kind of factual situation.

The most recent case from this Court dealing with this question is *Eli Lilly & Co.* v. *Sav-On-Drugs,* 366 U. S. 276 (1961), where the Court said:

> "[I]f Lilly is engaged in intrastate as well as interstate aspects of the New Jersey drug business, the State can require it to get a certificate of authority to do business. In such a situation, Lilly could not escape state regulation merely because it is also engaged in interstate commerce." *Id.,* at 279 (footnote omitted).

In *Lilly,* the facts supporting a "corporate presence" in New Jersey were probably stronger than the facts supporting a conclusion that Allenberg was "doing business" in Mississippi in this case. But it is of some importance to note that the intrastate contacts between Lilly and New Jersey had no apparent connection with the suit which Lilly sought to bring against Sav-On-Drugs; the Court held that there were sufficient intrastate activities of Lilly so that it could be required generally to qualify to do business in New Jersey, rather than that Lilly's business with Sav-On was intrastate. Here the very dealings of Allenberg which are concededly intrastate are the dealings between it and Pittman revolving around the contract upon which it seeks to sue in the Mississippi courts.

But even if I were able to agree with the Court that

Allenberg's activities in Mississippi were purely "interstate," I do not believe that our cases, properly understood, prevent Mississippi from exacting qualification from a foreign corporation as a condition for use of the Mississippi courts.

It has been settled since Mr. Chief Justice Taney's opinion for the Court in *Bank of Augusta* v. *Earle,* 13 Pet. 519 (1839), that a corporation organized in one State which seeks to do business in another State may be required by the latter to qualify under its laws before doing such business. An exception to this general rule was established in cases such as *Crutcher* v. *Kentucky,* 141 U. S. 47 (1891), in which the Court held that such a license might not be required of an express company engaged only in interstate commerce. *Id.,* at 56–57. That exception was subsequently applied in *International Textbook Co.* v. *Pigg,* 217 U. S. 91 (1910), and expanded in *Dahnke-Walker Milling Co.* v. *Bondurant,* 257 U. S. 282 (1921), and *Shafer* v. *Farmers Grain Co.,* 268 U. S. 189 (1925).

The Court today excerpts a paragraph from *Shafer* dealing with wheat, and cites it for the apparent proposition that trading in agricultural commodities, whether wheat or cotton, is a form of interstate commerce which may not be regulated by the States. But *Shafer* invalidated, not a statute requiring a foreign corporation to qualify to do business before using the courts, but instead a comprehensive statutory scheme regulating the method by which grain might be sold. The Court in its opinion in *Shafer* was careful to distinguish other situations in which state regulation of trade in agricultural commodities which concededly went across state lines had been upheld. *Id.,* at 201–202.

*Dahnke-Walker Milling Co., supra,* did deal with a statute requiring foreign corporations to qualify, and the

Court held the state statute could not be applied consistently with the Commerce Clause, but its reasoning in reaching this conclusion in no way supports the result the Court reaches today.

> "This contract was made in continuance of that practice, the plaintiff intending to forward the grain to its mill as soon as the delivery was made. In keeping with that purpose the delivery was to be on board the cars of a public carrier. Applying to these facts the principles before stated, we think the transaction was in interstate commerce. The state court, stressing the fact that the contract was made in Kentucky and was to be performed there, put aside the further facts that the delivery was to be on board the cars and that the plaintiff, in continuance of its prior practice, was purchasing the grain for shipment to its mill in Tennessee. We think the facts so neglected had a material bearing and should have been considered. *They show that what otherwise seemed an intrastate transaction was a part of interstate commerce.*" 257 U. S., at 292. (Emphasis added.)

Here, unlike the situation which the *Dahnke-Walker* Court regarded as critical there, Allenberg chose to store cotton owned by it in Mississippi warehouses for varying lengths of time in order that it might have a perpetual revolving inventory of cotton available for future shipment orders. Here, too, Allenberg had contracted with Mississippi farmers, including Pittman, to grow the cotton from seed.

Cases such as *Shafer, supra,* and *Dahnke-Walker, supra,* were decided during a period of this Court's history when the approved judicial technique "was to decide whether a subject was or was not interstate commerce; if it was, Congress alone could regulate it, and

if not, only the states could." [3] This doctrine of mutual exclusivity was largely dispelled in later cases beginning with *South Carolina Highway Dept.* v. *Barnwell Bros.,* 303 U. S. 177 (1938), and followed in a long line of succeeding cases. [4] The rule stated by the Court in *Pike* v. *Bruce Church, Inc.,* 397 U. S. 137, 142 (1970), is quite different from that found in cases such as *Shafer* and *Dahnke-Walker:*

> "Where the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits."

In *Union Brokerage Co.* v. *Jensen,* 322 U. S. 202 (1944), [5] this Court upheld Minnesota's denial of access to its courts to a North Dakota customhouse broker, whose sole business in Minnesota was interstate commerce, where the

---

[3] Stern, The Commerce Clause and the National Economy, 1933–1946, 59 Harv. L. Rev. 645, 648 (1946). See also P. Benson, The Supreme Court and the Commerce Clause, 1937–1970 (1970).

[4] In addition to *Shafer* v. *Farmers Grain Co.,* 268 U. S. 189 (1925), and *Dahnke-Walker Milling Co.* v. *Bondurant,* 257 U. S. 282 (1921), the Court today relies on *Swift & Co.* v. *United States,* 196 U. S. 375 (1905); *Stafford* v. *Wallace,* 258 U. S. 495 (1922); and *Chicago Board of Trade* v. *Olsen,* 262 U. S. 1 (1923). These cases upheld *federal* regulatory legislation applied to commodities exchanges as justified by the commerce power. Unless the Court today takes a giant step backwards, these are not relevant to the question of the constitutionality of Mississippi's statute. See, *e. g., Di Santo* v. *Pennsylvania,* 273 U. S. 34, 37 (1927) (Brandeis, J., joined by Holmes, J., dissenting), a case later overruled in *California* v. *Thompson,* 313 U. S. 109, 116 (1941).

[5] The Court distinguishes *Union Brokerage* on the ground that the activities of the broker there were "localized" interstate commerce, but a comparison of the facts of that case with the facts here suggests that Allenberg's activities in Mississippi were every bit as "localized" as those of Union Brokerage in Minnesota.

broker had failed to qualify as required of such foreign corporations:

> "[T]he Commerce Clause does not cut the States off from all legislative relation to foreign and interstate commerce. *South Carolina Highway Dept.* v. *Barnwell Bros.*, 303 U. S. 177 . . . . The incidence of the particular state enactment must determine whether it has transgressed the power left to the States to protect their special state interests although it is related to a phase of a more extensive commercial process." *Id.*, at 209–210.

See *Parker* v. *Brown*, 317 U. S. 341, 361 (1942).

Mississippi's qualification statute is concededly not discriminatory. Domestic corporations organized under her laws must submit themselves to her taxing jurisdiction, to service of process within the State, and to a number of other incidents of corporate existence which state law may impose. *Union Brokerage* recognized that qualification statutes were important in the collection of state taxes by identifying foreign corporations operating within the State [6] and in the protection of citizens

---

[6] Most commentators studying qualification statutes have concluded that a major purpose of such statutes is facilitation of the assessment and collection of state ad valorem and franchise taxes. See, *e. g.*, Comment, Foreign Corporations-State Boundaries for National Business, 59 Yale L. J. 737, 746 (1950). Cases such as *Chassaniol* v. *Greenwood*, 291 U. S. 584 (1934); *Federal Compress Co.* v. *McLean*, 291 U. S. 17 (1934); and *Kosydar* v. *National Cash Register Co.*, 417 U. S. 62 (1974), make it clear that the cotton stored in Mississippi is subject to state taxation. Mississippi Code Ann. § 27–13–7 (1972) imposes a franchise tax on foreign corporations operating within the State measured by the amount of capital located in Mississippi. A portion of the information required to be filed with the Mississippi Secretary of State in order to qualify within the State is an estimate of capital located within Mississippi. The information is essential to the identification of foreign corporations subject to the tax. The Court today leaves the tax standing but illogically deprives Mississippi of its sole means of enforcement of the tax.

within the State through insuring ready susceptibility of the corporation to service of process.[7] The qualification statute also serves an important informational function making available to citizens of the State who may deal with the foreign corporation details of its financing and control.[8] Although the result of Allenberg's failure to comply with the qualification statute is a drastic one,[9] our

---

[7] Although it may be possible to assert jurisdiction over an unqualified foreign corporation doing business in the State under a long-arm statute since minimum contacts with the State will normally exist, the absence of a registered agent in the State creates substantial problems for any potential plaintiff since he will be required to prove the existence of such minimum contacts—often in the absence of any subpoena power over the foreign corporation. See, e. g., Note, The Supreme Court, 1960 Term, 75 Harv. L. Rev. 40, 138, 140 (1961). In this area such qualification statutes provide a rough form of reciprocity (a guarantee of susceptibility of suit in exchange for the right to bring suit) and operate as security for performance of the foreign corporation's obligations owed to citizens of the State. Cf. *Paul* v. *Virginia*, 8 Wall. 168, 181 (1869). See, e. g., Comment, *supra*, n. 6, 59 Yale L. J., at 742–745.

[8] See, e. g., Comment, The *Lilly* Case: Dictum, Holding, and Finding, 57 Nw. U. L. Rev. 306, 321 (1962). While state and federal securities laws may on occasion provide parallel disclosures, they will often not. For example, in the immediate case, there is no indication that Allenberg was subject to any disclosure requirements other than those provided by the qualification statute. Mississippi requires such foreign corporations to update information in their certificates through annual reports. Miss. Code Ann. § 79–3–249 (1972). This information is available to all citizens of the State through payment of a nominal fee to the Secretary of State's office. § 79–3–257. Information such as the financial structure and control of the foreign corporation is obviously highly relevant to any citizen of Mississippi who is considering doing business with the corporation.

[9] The large variety of possible sanctions imposed by the States was discussed at length in Note, Sanctions for Failure to Comply with Corporate Qualification Statutes: An Evaluation, 63 Col. L. Rev. 117, 122–123 (1963). "Because of the difficulties involved in discovery and enforcement by state officials, denial of access to state

decisions hold that the burden imposed on interstate commerce by such statutes is to be judged with reference to the measures required to comply with such legislation, and not to the sanctions imposed for violation of it. *Eli Lilly,* 366 U. S., at 282–283; *Railway Express Co.* v. *Virginia,* 282 U. S. 440, 444 (1931). The steps necessary in order to comply with this statute are not unreasonably burdensome.[10]

I would not expand the holdings of *Shafer* and *Dahnke-Walker* in the face of so substantial a body of subsequent case law which leaves their reasoning, if not their holdings, suspect. I would affirm the judgment of the Supreme Court of Mississippi.

---

courts is an essential element of a statutory scheme designed to encourage compliance with qualification requirements." *Id.,* at 129–130 (footnote omitted). The denial-of-a-forum sanction utilized by Mississippi is also used by five other States. Ala. Code, Tit. 10, § 21 (89) (1973 Cum. Supp.); Ariz. Rev. Stat. Ann. § 10–482 (1956); Ark. Stat. Ann. § 64–1202 (1966); Vt. Stat. Ann., Tit. 11, § 2120 (1973). The rule is applied in Montana by case law. Note, Right of a Foreign Corporation to Sue upon Contracts in Montana Courts—Doing Business—Failure to Qualify—Subsequent Qualification, 26 Mont. L. Rev. 218 (1965). There may certainly be a dispute as to the wisdom of Mississippi's choice of this sanction but unless substantive due process now clothed in Commerce Clause garb once more elevates the Court into an arbiter of legislative wisdom, this consideration is irrelevant to our disposition of the case.

[10] The principal requirements are the filing of certain information with the Mississippi Secretary of State and the payment of a fee ranging between $20 and $500 depending on the amount of stated capital of the foreign corporation. Miss. Code Ann. §§ 79–3–219 and 79–3–255 (q) (1972). When the required information is provided and the fee is paid, the Secretary of State issues the requested certificate. § 79–3–221. The burden of qualifying appears small, particularly when compared to Allenberg's activities in the State. See *Union Brokerage Co.* v. *Jensen,* 322 U. S. 202, 210 (1944).