Commonwealth of Pennsylvania, Plaintiff, *v.* National Federation of the Blind and American Brotherhood for the Blind, Inc., Defendants.

Argued January 8, 1975, before President Judge BOWMAN and Judges CRUMLISH, JR., KRAMER, WILKINSON, JR., MENCER, ROGERS and BLATT.

*Allen C. Warshaw,* Deputy Attorney General, with him *Lawrence Silver,* Deputy Attorney General, and *Israel Packel,* Attorney General, for plaintiff.

*Jerome H. Gerber,* with him *James L. Cowden* and *Handler, Gerber and Weinstock,* for defendants.

OPINION BY PRESIDENT JUDGE BOWMAN, April 10, 1975:

The National Federation of the Blind and the American Brotherhood for the Blind, Inc. (defendants) are "charitable organizations" within the meaning of the Solicitation of Charitable Funds Act (Act).[1] Defendants have solicited and desire to continue to solicit contri-

---

1. Section 2(1) of the Act of August 9, 1963, P. L. 628, *as amended,* 10 P.S. §160-2(1) (Supp. 1974-1975).

butions from residents of Pennsylvania. The vehicle for these solicitations has been the United States mail.

On August 14, 1974, the Commonwealth, through the Attorney General, filed a complaint in equity, by which it seeks to enjoin further solicitations from Pennsylvania residents, unless and until defendants comply with the registration requirements of the Act.[2]

On August 30, 1974, defendants filed preliminary objections, which raise several constitutional issues, as well as a motion in the nature of a demurrer. Whether these preliminary objections should be sustained, in whole or in part, is the question now before this Court.

Defendants initially challenge the jurisdiction of this Court over their persons as having been obtained in derogation of their rights to due process under the Fourteenth Amendment of the United States Constitution. Defendants' due process attack is twofold. First, it is asserted that the Act deprives them of due process in that it purports to regulate out-of-state charities whose only contacts with the Commonwealth and its residents have arisen via the mails.[3] Defendants have had neither office facilities nor agents in Pennsylvania, and they preceive their presence in this state as being too insubstantial to justify any local judicial scrutiny of their activities. With this we cannot agree.

The United States Supreme Court has formulated guidelines for determining whether the courts of a state may constitutionally obtain in personam jurisdiction over out-of-state residents.

"[D]ue process requires only that in order to subject a defendant to a judgment in personam, if he be not present within the territory of the forum, he have certain *minimal contacts* with it such that

---

2. Section 3, 10 P.S. §160-3.

3. *See* Sections 3(a) and 2(10) of the Act, 10 P.S. §§160-3(a), 160-2(10), respectively.

the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' [Citations omitted.]" (Emphasis added.)[4] The "minimal contacts" required in a particular case may depend upon a variety of factors, including the manner in which the state seeks to regulate, whether the state possesses a "manifest interest" in protecting the welfare of its citizenry within the sphere in which the outsider operates, and the quantum of activity performed by the outsider within the state.[5]

In the case at hand, the Act obligates a charity, which solicits in Pennsylvania, to register with the Department of State. Where a state attempts to tax an outsider, or to deny him access to the courts of that state for failure to comply with a particular regulatory scheme, more tangible "minimal contacts" may be demanded. However, a registration requirement is perhaps the least burdensome among the various modes of regulation a state may seek to impose upon an outsider. Therefore, less "minimal contacts" need be found in order to conclude that due process has been satisfied.

While *McGee, supra,* sustains the proposition that in personam jurisdiction may be obtained over an outsider whose sole contacts with the forum state occur through the mails, defendants contend that such insubstantial "minimal contacts" have due process sufficiency only where the outsider is in the insurance business. The defendants cite *Hanson v. Denckla*[6] as support for this limitation. In *Hanson,* an insurer was not involved, but the Court's conclusion did not derive from the absence of insurance activity within the forum state. Rather, the

---

4. *International Shoe v. Washington,* 326 U.S. 310, 316 (1945).

5. *McGee v. International Life Insurance Co.,* 355 U.S. 220 (1957).

6. 357 U.S. 235 (1958).

court could discover *no activity whatsoever*. The *Hanson* court also distinguished *McGee* "in that there the State had enacted special legislation (Unauthorized Insurers Process Act) to exercise what McGee called its 'manifest interest' in providing effective redress for citizens who had been injured by nonresidents engaged in an activity that the state treats as exceptional and subjects to regulation." 357 U.S. at 252. The quoted portion suggests that the enactment of "special legislation" by the forum state creates a presumption that the state has a "manifest interest" in a particular area and, given the performance of the regulated activity within the forum state, the performer will become subject to the dictates of such legislation. There will exist the "minimal contacts" essential to a determination of constitutionality under the Fourteenth Amendment. Here, Pennsylvania has chosen to regulate specially the solicitation of charitable donations within its boundaries. Defendants have engaged in this regulated activity, and have thus established "minimal contacts" with Pennsylvania.

Of course, a state may not be permitted to "bootstrap" itself in order to prove a "manifest interest" in a particular area. That is, the enactment of special legislation does not create an irrebutable presumption that the state has a "manifest interest" in the area regulated. The interest sought to be protected must be closely examined. While out-of-state insurance companies are an obvious medium for fraudulent activity if they are allowed to conduct business absent any regulation by the forum state, charities may present an even more acute problem. Because they possess a natural aura of trustworthiness, solicitations for charity tend to diminish or eliminate the healthy skepticism with which people receive commercial solicitations. In essence, this is a unique area, one in which the state must substitute its own skepticism for that of its citizenry. By denying the state the power to exercise some control over out-of-state charities, we

would be encouraging those charities whose philanthropy is directed more to their members than to their alleged beneficiaries to organize in jurisdictions whose regulatory schemes are weak or nonexistent. Such "charities" could thus, with virtual immunity, spread their tenacles beyond the bounds of home, and subject naive citizens of other states to their supplications.

Lastly, implicit in the very language of the "minimal contacts" test is the recognition of a potential for an increase in the degree of activity being performed by the outsider, within the state seeking to regulate. There must exist a *minimal* level of activity within the forum state in order to legitimize, under the Fourteenth Amendment, state regulation of the actor. "Minimal" suggests that the actor could become more active, and thereby increase his effectiveness within and/or impact upon the forum state and its residents. Mailed solicitations may result in some new business for an out-of-state insured, but the presence of agents and/or an office within the forum state would clearly generate an even greater volume of new business. Where charities are concerned, it is not illogical to assume that the mailing of solicitations is as effective as any other means of obtaining contributions. While few people are apt to purchase insurance or other commodities without an opportunity to examine both the producer and the product (an opportunity not generally provided by the mails), the prospective charitable donor assumes a much different posture. He or she need only decide whether to give or not to give, a question that may be posed as readily and effectively through the mails as through any other vehicle. Therefore, in the case of an out-of-state charity, solicitation through the mails may not be the "minimal contact," but more likely the *only contact* necessary to the complete achievement of the charity's goals. For that reason, mailed solicitations by an out-of-state charity must be perceived, for purposes of the "minimal contacts" test, on the same level as that

of a much greater evidence of activity by a commercial enterprise.

In light of the preceding, defendants have established "minimal contacts" with Pennsylvania by their mailings of solicitations to residents of this Commonwealth.

Defendants' second due process argument is based upon the actual mechanics for service of process upon out-of-state charities. Section 13 of the Act, 10 P.S. §160-13, provides for service upon the Secretary of the Commonwealth, who then becomes responsible for notifying the defendant charity (ies). Section 13 requires such notification be "by registered or certified mail with return receipt requested. . . ." Defendants contend that the Secretary occupies two roles in this proceeding, namely, those of agent for service and party-plaintiff, and that this dual characterization creates a conflict of interest which deprives defendants of their due process protections.

While the enforcement section of the Act[7] contemplates a possible interaction or collaboration between the Secretary and the Attorney General, it is only the latter who is specifically authorized to initiate an action against an alleged violator of the Act. Defendants concede that the Secretary is not the authorized named plaintiff, but they would nonetheless have this Court "pierce the prosecutorial veil. "Assuming the Secretary does, in fact, "wear two hats" in proceedings under the Act, there does not exist a violation of due process. In determining whether a particular method of service satisfies the Fourteenth Amendment, a court need only conclude "that the particular form of substituted service adopted . . . gives reasonable assurance that notice will be actual." *International Shoe, supra* note 4, at 320. The Supreme Court has found such "reasonable assurance" where substituted service was actualized by registered mail. *Travelers*

---

7. 10 P.S. §160-14.

*Health Association v. Virginia,* 339 U.S. 643 (1950). Absent a showing that the dual role, allegedly assumed by the Secretary, reduces the likelihood that the notice to a defendant will be actual, this Court cannot conclude that the method of service provided in the Act impinges upon defendants' due process rights.

Defendants' preliminary objections also question the jurisdiction of this Court over the subject matter of this litigation. Defendants contend that the Act authorizes the Commonwealth to unconstitutionally invade the exclusive domain of the Federal Government in matters involving interstate commerce and the use of the mails.

There exist at least four variables which have been viewed as relevant in determining whether a particular form of local regulation of interstate transactions is violative of the commerce clause of the Federal Constitution.[8] These are: (1) the type of transaction sought to be regulated; (2) the manner in which the transaction is sought to be regulated; (3) whether the regulation is discriminatory in favor of local businesses conducting similar transactions; and (4) the particular local interest sought to be protected by the regulation. *Allenberg Cotton Co., Inc. v. Pittman,* 42 L. Ed. 2d 195 (1974), illustrates the application of these variables to a fact situation.

The *Allenberg* controversy arose when the courts of Mississippi denied a judicial forum to a Tennessee merchant who was attempting to collect damages in an assumpsit action. The reason given for closing the courtroom doors was the failure of the merchant to have registered to do business in Mississippi, as required by statute. Although the other party to the contract at issue was a Mississippi cotton farmer, and despite the fact that the merchant owned a storage facility which was located in Mississippi and to which the cotton was to have been

---

8. U.S. Const. art. I, §8.

transported, the Supreme Court concluded that the transaction was not sufficiently intrastate in character so as to justify this type of local governmental interference. Among the factors emphasized by the court were the "intricate interstate marketing mechanism"[9] (namely, the cotton industry) sought to be controlled, the potential for breakdown in an area of great national economic interest should the controls be found constitutional, and the harshness of the state's punitive measures in cases of nonregistration. Further, the regulatory scheme discriminated against out-of-state businesses, and the only apparent interests sought to be protected were those of local business concerns. Nevertheless, by specifically refusing to consider the questions, the court suggested that, instead of denying him access to its court system, had Mississippi attempted to tax the Tennessee merchant and/or subject him to the jurisdiction of the local courts, a different conclusion would have been reached.

The situation before this Court is completely dissimilar from that before the Supreme Court in *Allenberg*. While charities perform a laudatory function, that function cannot be perceived as an integral link in the national economic chain. There exists no potential for partial or total economic collapse where charities are regulated on a local level. Also, the provisions of the Act are neither harsh nor discriminatory, and are not likely to discourage legitimate out-of-state charities from soliciting in Pennsylvania. Since the Act has equal applicability to local and out-of-state charities, it is certainly not the former whom the Act seeks to protect. Rather, the Act is a temperate response to the need of the citizens of this Commonwealth for protection from fraudulent devices in the guise of charity. The Act does not unduly interfere with interstate commerce, and the commerce clause does not prevent this Court from assuming jurisdiction over the subject matter of this litigation.

---

9. 42 L. Ed. 2d at 204.

The postal clause of the Federal Constitution[10] vests in Congress the exclusive control over the processing, transmission and delivery of the mails. Contrary to defendants' assertions, however, it does not thereby deny the several states the power to regulate activities whose performance may be effectuated through the use of the mails.[11] Defendants' espoused interpretation of the postal clause would, if adopted, effectively strip the states of any regulatory power over the importation of products, where such importation is accomplished via the mails, and would thus provide a ready vehicle for the perpetration of fraud and other evils.

The Act neither attempts nor attains any interference with the operation of the postal system. It merely regulates the solicitation of funds by charitable organizations.[12] As such, it is not violative of the postal clause, and its enforcement is clearly within the subject matter jurisdiction of this Court.

Defendants' final preliminary objection is in the nature of a demurrer. Defendants contend that the Commonwealth's complaint failed to aver the performance of a condition precedent to the commencement of this action.

Section 14 of the Act[13] reads, in pertinent part, as follows:

"(f) *Whenever* the Attorney General . . . shall have reason to believe or shall be advised by the Secretary of the Commonwealth *(who shall have*

10. U.S. Const. art. I, §8.

11. *Ministers Life & Casualty Union v. Haase,* 30 Wis. 2d 339, 141 N.W. 2d 287 (1966), *appeal dismissed,* 385 U.S. 205 (1966), *rehearing denied,* 385 U.S. 1033 (1967).

12. Section 1.1 of the Act, as added by Act of October 26, 1972, P.L. 1011, §1, 10 P.S. §160-1.1.

13. As added by Act of October 26, 1972, P.L. 1011, §7, 10 P.S. §160-14.

*given due notice and full hearing to the charitable organization . . .*) that the said . . . charitable organization . . . is operating in violation of the provisions of this act or has knowingly and wilfully made any false statements in any initial or any renewal application to solicit or in any other information required to be filed by this act *or whenever* a charitable organization . . . has failed to filed [sic] a registration statement required by this act . . . the Attorney General . . . may bring an action in the name of the Commonwealth of Pennsylvania against such charitable organization and its officers . . . ." (Emphasis added.) Defendants argue that the Commonwealth's failure to aver the giving of due notice and the opportunity for defendants to be heard before the Secretary is fatal to the cause of action asserted. The Commonwealth responds that such notice and hearing are only demanded when the charitable organization, charged under the Act, has previously filed a registration statement, and is alleged to have violated one of the other of the Act's provisions. This Court adopts the Commonwealth's position, but for reasons other than those asserted by it.

The key word employed in section 14(f) is "whenever." It appears at the beginning of the section and is repeated several times thereafter. This Court views these repetitions of "whenever" as manifesting a legislative intent that the language which follows each use of that word is to be read without reference to the language which preceded such use. That is, the elements of each offense enumerated in section 14(f) are to be considered independently of the elements of the other offenses so enumerated. No cumulative effect was intended. Thus, the power vested in the Attorney General to initiate an action based upon a charitable organization's failure to have filed a registration statement is not subject to whatever conditions may attach to the initiation of actions based upon other violations of the Act. While "due

notice and full hearing" may be necessary where certain other violations are alleged, they cannot be interpreted, under the clear language of section 14, to be conditions precedent to the commencement of this particular action. The Commonwealth's complaint is therefore sufficient, and the demurrer must fail.

Accordingly, we issue the following

### ORDER

Now, April 10, 1975, defendants' preliminary objections are hereby overruled, and defendants are directed to answer plaintiff's complaint within thirty (30) days of the date of this Order.