**KACHEMAK SEAFOODS, INC.,**
**Appellant,**

v.

**CENTURY AIRLINES, INC., Appellee.**

**No. 5768.**

Supreme Court of Alaska.

March 5, 1982.

---

Michael W. Sharon, Hartig, Rhodes, Norman & Mahoney, Anchorage, for appellant.

Clark Reed Nichols, Perkins, Coie, Stone, Olsen & Williams, Anchorage, for appellee.

Before BURKE, C. J., and RABINOWITZ, CONNOR, MATTHEWS and COMPTON, JJ.

## OPINION

MATTHEWS, Justice.

This appeal involves the construction and application of AS 10.05.690.[1] That statute denies an unregistered foreign corporation "transacting business" in the state the right to maintain suit in an Alaska court. In the proceedings below, appellant moved for summary judgment, arguing that appellee's suit against it was barred under AS 10.05.-690. The trial court denied that motion and, after trial and a judgment in appellee's favor, this appeal was taken. We affirm.

Century Airlines, Inc. is a Michigan corporation owned by Clark Cryderman and his wife. Its sole office is located in Ponti-

ac, Michigan and, with one exception, Century has never stationed employees or representatives outside of that state. Prior to 1975, Century's business consisted of chartering airplanes, selling aviation fuel and occasionally selling airplanes. Century had never had any contact with Alaska or Alaskan businesses before the events which have led to this appeal occurred.

Sometime in 1975, an officer of Kodiak Western Airlines, Inc., an Alaska corporation, called Cryderman to inquire about leasing a DC3 airplane from Century for the summer. Century had never before leased aircraft, but as a result of this conversation Century agreed to lease Kodiak a DC3. Kodiak prepared and signed the lease in Alaska and then mailed it to Michigan, where Cryderman signed it on Century's behalf. Under the lease, Century was to supply all parts that might be needed for repairs, and to perform engine overhauls or replacements. Kodiak was otherwise responsible for maintaining and servicing the leased aircraft.

Prior to the airplane's delivery, Kodiak agreed to sublease it to Kachemak Seafoods, Inc. Kachemak is an Alaska corporation headquartered in Togiak, Alaska, and owned by Robert Needham and his wife. Kachemak processes and markets salmon, using aircraft from June to mid-September to fly salmon into Anchorage which are then flown to Seattle for marketing.

The leased DC3 was flown from Michigan to Togiak by a Kachemak pilot. Cryderman went along on this flight to view Kachemak's operations and to see the state. He remained in Alaska for about a week and while in Togiak spoke with Needham. During that conversation, Needham brought up the possibility of Century leasing aircraft directly to Kachemak in future

---

1. AS 10.05.690 provides:

A foreign corporation transacting business in the state without a certificate of authority may not maintain an action, suit or proceeding in a court of the state until it obtains a certificate of authority. A successor or assignee of a foreign corporation transacting business without a certificate of authority may not maintain an ac-

tion, suit or proceeding in a court of the state on a right, claim or demand arising out of the transaction of business by the corporation in the state until a certificate of authority is obtained by the corporation or by a corporation which has acquired all or substantially all of its assets.

years, but Cryderman stated that he "wasn't interested in circumnavigating [Kodiak] to go direct."

At the end of the 1975 lease period as the plane began its ferry flight back to Michigan, it developed engine problems in Dillingham, Alaska. Cryderman talked to both the Kachemak pilot and a Kodiak mechanic and learned that the engine had seized. He had a spare engine and a Century mechanic flown to Dillingham who, with the assistance of Kodiak's mechanics, changed the engine.

A dispute later arose between Century and Kodiak regarding responsibility for the labor cost of installing the engine and the cost of ferrying the plane back to Michigan. Century had borne these costs and felt that it was entitled to reimbursement by Kodiak. Although Century did not pursue the matter at that time, Century decided not to lease to Kodiak again.

In the fall of 1975, Needham wrote to Cryderman expressing his interest in leasing directly from Century. Cryderman did not respond and sometime in 1976 Needham again wrote Cryderman. This time Cryderman answered, stating that Century would not enter into any further leasing arrangements until it had been paid for the previous year, referring to the amount assertedly still owed Century by Kodiak. Needham replied that Kachemak would take care of that debt if that was what it would take to get Century to lease aircraft to Kachemak. This resulted in the June 11, 1976 lease agreement,[2] which was prepared and signed by Kachemak in Alaska and signed by Century in Michigan.

The 1976 lease covered two DC3 aircraft. The lease was for a minimum of two months but could be renewed semimonthly at Kachemak's option. Kachemak was to pay the cost of ferrying the planes to Alaska and returning them to Michigan. Kachemak was also to procure liability insurance and to reimburse Century for the

cost of hull insurance on the aircraft for the lease period. The lease obligated Kachemak to provide the flight crews and the fuel and lubricants for operating the leased planes, and to perform all maintenance and repairs other than the major overhaul or replacement of engines and airframes. Unlike its 1975 lease with Kodiak, Century was not responsible for supplying parts for ordinary wear and tear.[3]

In late August of 1976, Cryderman traveled to Alaska to try to collect the money Kodiak allegedly still owed Century and to negotiate the sale of one of its leased aircraft to Kachemak. Upon arriving, Cryderman learned that one of the DC3s had developed engine troubles, apparently due to a damaged cylinder, so he flew to Togiak where the plane was grounded. After he arrived, Kachemak mechanics changed the cylinder and started the engine, but then shut it off as the engine was not running smoothly.

At this point, according to Cryderman, Kachemak's mechanics concluded that the engine had failed, and Needham told Cryderman that Century was responsible for fixing the engine and for returning the plane to Michigan. Needham, on the other hand, stated that it was Cryderman that concluded the engine had failed and that "Cryderman took effective control of the aircraft." Cryderman had an engine and a Century mechanic flown to Alaska where, with the aid of several local mechanics, the replacement engine was installed, and the plane was then flown back to Michigan.

While still in Alaska, Cryderman continued negotiating with Needham the sale of the other leased aircraft. They agreed that Century would sell the plane to Kachemak, subject to Kachemak's approval after inspecting the plane and its maintenance history. The sale, however, was never consummated. According to Cryderman, Kachemak failed to tender the full purchase price in time, so he had the plane flown

---

**2.** The lease agreement, however, is silent as regards Kachemak's purported agreement to satisfy Kodiak's debt to Century.

**3.** From time to time during the lease Century did supply Kachemak with parts in order for Kachemak to service the leased aircraft.

back to Michigan. Needham stated that there was no definite date by which the purchase price had to be tendered and that Century removed the plane before Kachemak had a reasonable opportunity to inspect it.

In August of 1977, Century filed a complaint in superior court alleging that Kachemak had breached the 1976 lease. Kachemak denied all liability and filed a counterclaim alleging that Century had breached the sales agreement. In July of 1980, Kachemak moved for summary judgment on the ground that Century's suit was barred by AS 10.05.690. This motion was denied and the case was then tried before the lower court sitting without a jury. The court found that Kachemak owed Century $13,294.00 on the lease agreement and entered judgment for that amount plus interest, costs and attorney's fees, offset by $7,000.00 in damages for Century's breach of the sales agreement.

In its Statement of Points on Appeal, Kachemak asserts:

> The trial court erred when it failed to find that Plaintiff was required to register in the state of Alaska, and that the same is a condition to bringing suit in this state.

We now proceed to address that contention.

Under the Alaska Business Corporation Act, "[n]o foreign corporation may transact business in the state until it has procured a certificate of authority from the commissioner." AS 10.05.597. Among the sanctions imposed upon a foreign corporation that fails to comply with this mandate is that found in AS 10.05.690.

> A foreign corporation transacting business in the state without a certificate of authority may not maintain an action, suit or proceeding in a court of the state until it obtains a certificate of authority. . . .

Thus, to have prevailed on its motion below, Kachemak had to show that Century was "transacting business" in this state as that term is used in AS 10.05.690. See, e.g., Wallace v. Lincoln Leasing Corp., 547 S.W.2d 56, 57 (Tex.Civ.App.1977); Filmak-

ers Releasing Organization v. Realart Pictures, Inc., 374 S.W.2d 535, 539 (Mo.App. 1964).

■ Phrases such as "transacting business" and "doing business" most frequently appear in three distinct statutory contexts: (1) jurisdictional statutes; (2) taxation statutes; and (3) foreign corporation qualification statutes. The meaning of these terms varies with the context in which they are used. It is generally agreed, however, that subjecting a foreign corporation to a state's qualification statutes requires more activity within a state than for service or taxation. See, e.g., Cement Asbestos Products Co. v. Hartford Accident & Indemnity Co., 592 F.2d 1144, 1147 (10th Cir. 1979) (construing Colorado law); Rochester Capital Leasing Corp. v. Sprague, 13 Ariz.App. 77, 474 P.2d 201, 203 (1970); R. Leflar, American Conflicts Law 517–18 (3d ed. 1977). See also 36 Am.Jur.2d Foreign Corporations § 324 at 319 (1968). Indeed, this court has twice recognized that a foreign corporation could be "transacting business" of such a nature that it would not be required to obtain a certificate of authority yet still be subject to service of process under AS 10.05.642, the key phrase of which is "transact business." Stephenson v. Duriron Co., 401 P.2d 423, 424 (Alaska), cert. denied, 382 U.S. 956, 86 S.Ct. 431, 15 L.Ed.2d 360 (1965); Northern Supply, Inc. v. Curtiss-Wright Corp., 397 P.2d 1013, 1016 (Alaska 1965).

While the corporation act does not define the term, it expressly excludes certain conduct from the definition of "transacting business." AS 10.05.600 lists ten types of activities which, whether conducted alone or together, will not call into play Alaska's foreign corporation regulations. Of particular importance to the disposition of this appeal is subsection (9), which exempts "transacting business in interstate commerce. . . ." The enactment of this exemption was a recognition of the limits upon state power imposed by the commerce clause of the United States Constitution and was meant to be coextensive with those limits. Compare Diversacon Industries, Inc. v. National Bank of Commerce, 629 F.2d

1030, 1034 (5th Cir. 1980) (applying Mississippi law). We therefore look to decisions under the commerce clause to determine both the scope of this exemption and whether Century's intrastate activities are included within it.

■ The most recent United States Supreme Court decision in point is *Allenberg Cotton Co. v. Pittman*, 419 U.S. 20, 95 S.Ct. 260, 42 L.Ed.2d 195 (1974). In that case the Court held that Mississippi could not constitutionally bar the suit of an unregistered foreign corporation that entered into contracts, arranged through an independent broker, with local farmers to purchase cotton which was temporarily stored in local warehouses for sorting and classification before shipment to other states. In reaching its decision, the court distinguished between instances in which a foreign corporation "localizes" its business in a state and those where it "enters the State 'to contribute to or to conclude a unitary interstate transaction.'" *Id.* at 32–33, 95 S.Ct. at 266–267, 42 L.Ed.2d at 205, *quoting Union Brokerage Co. v. Jensen*, 322 U.S. 202, 211, 64 S.Ct. 967, 973, 88 L.Ed. 1227, 1233 (1944). The Court noted that localization had not occurred since, among other reasons, the corporation had no office in Mississippi, and had no employees soliciting business or otherwise operating there on a regular basis. *Allenberg*, 419 U.S. at 33, 95 S.Ct. at 267, 42 L.Ed.2d at 206. When the element of localization is present, a state may constitutionally require that a foreign corporation qualify in the state as a condition to bringing suit there. This was the case in *Eli Lilly & Co. v. Sav-On-Drugs, Inc.*, 366 U.S. 276, 81 S.Ct. 1316, 6 L.Ed.2d 288 (1961), where the corporation maintained a staffed office and regularly employed eighteen salaried "detailmen" in New Jersey in order to promote the intrastate sale of its products by wholesalers to retailers and end users.

■ Applying these authorities to the facts presented by this appeal, we hold that Century was not "transacting business" in Alaska within the meaning of AS 10.05.690.

Century's only activities in this state were: (1) the presence of its president for a brief period in 1975 to view the operations in which its leased aircraft would be used; (2) the presence of one of its mechanics in 1975, who was sent to Alaska to change an engine so that its DC3 could continue its ferry flight back to Michigan at the end of the lease period; (3) the brief presence of its president in 1976, who came to the state to attempt to collect money allegedly still owed Century under its 1975 lease,[4] and to negotiate the sale of an airplane to Kachemak, and (4) the presence of one of its mechanics in 1976, who was sent to Alaska to change an engine so that Century's plane could be flown back to Michigan when a dispute arose under the 1976 lease.

This is not a case such as *Eli Lilly* where the foreign corporation engaged in intrastate activities separate and distinct from its interstate business. Rather, with the exception of the negotiations relating to the proposed sale, Century's intrastate activities were incidental to its interstate leasing of aircraft. As such, they were instances in which Century entered Alaska "to contribute to or to conclude" interstate commerce, *Allenberg*, 419 U.S. at 32–33, 95 S.Ct. at 266–267, 42 L.Ed.2d at 205, and were therefore exempt from regulation under AS 10.05.600(9). Nor does the occurrence of intrastate sales negotiations over an aircraft located in Alaska lead to the conclusion that Century "localized" its business in the state. The subject matter of these negotiations was an aircraft owned by a Michigan corporation. The presence of the plane in Alaska pursuant to an interstate leasing transaction does not alter the essential interstate character of the contemplated sale. *See Vulcan Steam Shovel Co. v. Flanders*, 205 F. 102 (E.D.Mich.1913); *see also Harcrow v. W. T. Rawleigh Co.*, 145 S.W.2d 925, 926 (Tex.Civ.App.1940); *American Soda Fountain Co. v. Hairston*, 69 S.W.2d 546, 552 (Tex.Civ.App.1934).

Because Century's activities in this state fall within the exemption found in AS 10.-

---

4. AS 10.05.600(8) specifically exempts such activity as a basis for requiring qualification. *See*

*Weaver v. O'Meara Motor Co.*, 452 P.2d 87, 89 (Alaska 1969).

05.600(9), it was not required to obtain a certificate of authority. Accordingly, the trial court did not err by denying Kachemak's summary judgment motion, as AS 10.05.690 did not apply.

The judgment is AFFIRMED.