**BLUEHIPPO FUNDING, LLC, a Maryland limited liability corporation and BlueHippo Capital, L.L.C., a Nevada limited liability corporation, Plaintiffs**

v.

**Darrell V. McGRAW, Jr., in his official capacity as Attorney General of the State of West Virginia, and Virgil T. Helton, in his official capacity as Secretary of the Department of Revenue of the State of West Virginia, Defendants.**

Civil Action No. 2:07–0399.

United States District Court,
S.D. West Virginia,
at Charleston.

Feb. 25, 2009.

Charles Lee Eisen, Nicholas G. Terris, Kirkpatrick & Lockhart Preston Gates Ellis, Washington, DC, Kara L. Cunningham, Russell D. Jessee, Steptoe & Johnson, Charleston, WV, for Plaintiffs.

Charli Fulton, Jill L. Miles, Andrew M. Fenway Pollack, Barbara H. Allen, Katherine A. Schultz, Office of the Attorney General, Charleston, WV, for Defendants.

### MEMORANDUM OPINION AND ORDER

JOHN T. COPENHAVER, JR., District Judge.

Pending are separate motions for summary judgment by (1) plaintiffs BlueHippo Funding, LLC ("BlueHippo Funding"), and BlueHippo Capital, L.L.C. ("BlueHippo Capital"), (2) defendant Secretary of the Department of Revenue Virgil T. Helton ("Secretary"), and (3) defendant Attorney General Darrell V. McGraw, Jr. ("Attorney General"), all filed May 8, 2008.[1]

Discovery disputes remained pending before the magistrate judge and discovery continued after the filing of the aforementioned motions. On August 6, 2008, plaintiffs' counsel advised the court of the necessity of supplemental briefing based upon discovery taken after the dispositive motions were filed. On August 12, 2008, counsel were directed to confer and advise the court no later than August 27, 2008, concerning the necessity of (1) further briefing, and (2) a bench trial or, alternatively, the suitability of submitting the case based upon the parties' summary judgment briefing.

After receiving the parties' input, the court allowed the requested supplemental summary judgment briefing. The supplemental briefing concluded on October 23, 2008. The existing scheduling order was vacated pending "a ruling on the parties' summary judgment motions that might obviate the need for further proceedings." *Bluehippo Funding, LLC v. McGraw,* No. 2:07–0399, at 2 (S.D.W.Va. Sept.24, 2008)(stating further "All parties are in agreement that, if supplemental briefing is not permitted, the case is subject to final disposition based upon the existing summary judgment record. If supplemental briefing is allowed, defendants reserve the right to revise their position on whether a trial is necessary.").

## I.

**A. West Virginia Code Provisions Governing Telemarketers**

The West Virginia Consumer Credit and Protection Act ("Act"), West Virginia Code section 46A–1–101 *et seq.,* contains an article dealing with telemarketing ("Telemarketing Article"). The Telemarketing Article was added to the Act in 1998. 1998 W. Va. Acts Ch. 314. A "[t]elemarketer" is defined as "any person who initiates or receives telephone calls to or from a consumer in this state for the purpose of

---

1. This case is related to *State of West Virginia ex rel. McGraw v. BlueHippo Funding, LLC, et al.,* No. 07–C–438 (Cir.Ct.Kan.Cty. Mar. 12, 2007) (*"BlueHippo I "*), a civil enforcement action filed by the Attorney General in the Circuit Court of Kanawha County, removed, and then remanded by the undersigned on July 23, 2007. A discussion of both *BlueHippo I* and this action (*"BlueHippo II "*) is deemed necessary. References to the complaint in *BlueHippo I* are cited as "AG Compl." Citations to the complaint in *BlueHippo II* will appear as "Compl."

making a telemarketing solicitation as defined in section one hundred twelve of this article." W. Va.Code § 46A–6F–113(a).

A "[t]elemarketing solicitation" includes the following:

> any communication between a telemarketer and a prospective purchaser for the purpose of selling or attempting to sell the purchaser any consumer goods or services, if it is intended by the telemarketer that an agreement to purchase the consumer goods or services will be made after ... [t]he telemarketer communicates with a consumer by any means and invites or directs the consumer to respond by any means to the telemarketer's communications, and the telemarketer intends to enter into an agreement with the consumer for the purchase of consumer goods or services at some time during the course of one or more subsequent telephone communications with the consumer.

Id. § 46A–6F–112 (a)(2).

Telemarketers must register with the West Virginia Department of Tax and Revenue ("Department") and pay certain application fees at least 60 days before offering goods or services to consumers in West Virginia. Id. § 46A–6F–301(a) and (b). The application and annual renewal fees are set at $250, with a $50 discount available for web-based registrations and renewals. W. Va.C.S.R. § 119–301–2.2.1-.2. Telemarketers must also post a continuing surety bond or similar specified security. Id. § 46A–6F–302(a). The bond or other security must be in an amount of $100,000 for each telemarketing location or a single bond for all locations of $500,000

and approved by the Department. Id. ("The bond shall provide that the telemarketer will pay all damages to the State or a private person resulting from any unlawful act or action by the telemarketer or its agent in connection with the conduct of telemarketing activities.").

A telemarketer would typically expect to pay between 1% to 3% of the face amount to obtain the necessary bond. (AG Mem. in Supp. at 20). Failure to comply with the registration or security requirements may result in the assessment of a civil penalty of up to $5,000. Id. § 46A–6F–303(a)(1) and (2).

The Attorney General asserts that he has initiated only three prosecutions under the Telemarketing Article. (AG's Mem. in Supp. at 6). Each of the three charged entities, Alyon Technologies, IGIA, Inc., and BlueHippo, along with certain corporate principals, were charged civilly with, *inter alia*, both unfair or deceptive acts or practices and failure to register and provide surety as telemarketers.[2]

### B. BlueHippo's Business Activities

BlueHippo Funding is a Maryland citizen. (Compl. ¶ 5). BlueHippo Capital is a Nevada corporation, with its principal place of business in Maryland. (Id. ¶ 6).[3] BlueHippo offers computers and other electronic products for sale to the public using print, radio, television, and the Internet. (Id. ¶ 9; Ex. 2, Pls.' Mot. Summ. J., Dep. of John Burcham[4] at 102–03 ("Burcham Dep. at ——")). For example, BlueHippo television ads might appear on syndicated shows broadcast nationwide

---

2. The supplemental briefing references what appear to be two additional enforcement actions against International Readers League of Atlanta, Inc., and IGLO Workshop, Inc.

3. Unless otherwise noted, the plaintiffs are hereafter referred to collectively as "BlueHippo."

4. Mr. Burcham is the corporate counsel and assistant corporate secretary for both BlueHippo entities. (Id. at 5).

like "Judge Judy" or "Wheel of Fortune." (Burcham Dep. at 104–05).

BlueHippo relies upon independent agencies to determine advertising placement on a national basis, without directing promotional efforts to West Virginia in particular. (*See* Burcham Dep. at 102–09). BlueHippo has no physical presence, employees, agents, representatives, or salespeople in West Virginia. (*See* Compl. ¶ 13). It has never initiated calls to West Virginia consumers. (Compl. ¶ 11). Interested consumers contact BlueHippo instead, based upon the telephone number appearing in its various advertisements or through its Internet website. (*Id.* ¶ 12; Burcham Dep. at 32–33). After the consumer's initial telephone call, BlueHippo will, on occasion, respond to customer service inquiries via phone, facsimile, or e-mail. (Burcham Dep. at 34; Pls.' Mem. in Supp. at 4).

When a potential customer phones Blue-Hippo Funding he is routed to the Premier BPO call center in Pakistan.[5] (Burcham II Dep. at 31–32). BlueHippo provides the Pakistani contractor with prepared scripts to follow. (*Id.* at 32, 36). BlueHippo supervises the Premier BPO call center, in part, by periodically reviewing recordings of some calls. (*Id.* at 37).

Once a potential customer places a call and enters into a sales transaction with BlueHippo, documents are apparently sent to the individual by BlueHippo Funding to formally establish the buyer-seller relationship. (*Id.* at 23). The individual is then expected to make a certain number of payments to BlueHippo in order to qualify for financing from BlueHippo Capital.[6]

(*Id.* at 25). Once the individual makes a predetermined number of timely payments, typically between 4 to 13, BlueHippo Funding alerts BlueHippo Capital that the individual is qualified to obtain financing for the purchase of the desired computer equipment, at which time BlueHippo Capital mails the individual a financing agreement.[6] (*Id.* at 25). When the terms of the parties' agreement have been fulfilled, BlueHippo orders the consumer's requested merchandise from a supplier, who then ships the goods to the consumer. (Compl. ¶¶ 23, 25). BlueHippo maintains no inventory of its own. (Burcham Dep. at 69–70).

BlueHippo is currently defending several class actions filed against it in Maryland, California, Arkansas, and Oklahoma. (*Id.* at 127). Mr. Burcham testified that "some may be state actions and others are private causes of action." (*Id.* at 130).

C.  The *BlueHippo I* Enforcement Action

Neither BlueHippo Funding nor Blue-Hippo Capital appear to have registered as telemarketers as required by the Telemarketing Article. (Burcham II Dep. at 101–02). Prior to March 12, 2007, the date when the Attorney General instituted *BlueHippo I*, the Consumer Protection Division had received 17 consumer complaints against BlueHippo. (AG's Mot. Summ. J., Ex. 5, Aff. of Daphanie Mullins, at 1).

An investigation of these complaints disclosed alleged BlueHippo practices involving West Virginia consumers, including the following: (1) BlueHippo does not disclose

---

5.  In 2003, potential customers were routed instead to BlueHippo's call center in Maryland, which has since ceased operations. (Burcham II Dep. at 34).

6.  The payments necessary to qualify for financing typically arrive at BlueHippo by (1)

receipt of a personal check, or (2) the direct debit of the individual's bank account. (*Id.* at 64, 92). Mr. Burcham stated the debiting process, apparently conducted by a third party on BlueHippo's behalf, has occurred at "a number of banks" in West Virginia. (*Id.* at 64).

the total cost of the purchased goods and their financing, (2) any payments to Blue-Hippo are non-refundable until, *inter alia,* BlueHippo has obtained the consumer's approval of an electronic debiting arrangement, (3) the terms of the written agreements that the consumer is required to sign are not disclosed, (4) the right to cancel the transaction within seven days is not disclosed, (5) at least one of the computers billed as "the finest ... on the market" was in actuality "below the industry standard" at the time, (6) it is not disclosed that if the consumer pays late even once, he will be required to advance at least 66% of the total cost of the computer before it will be shipped, (7) some computer models offered by BlueHippo were, during the same period of time as advertised for sale, readily available in retail stores for less than half the amount charged by BlueHippo, and (8) BlueHippo's chosen arbitrator, the National Arbitration Forum, has entered at least one award in BlueHippo's favor in a proceeding where the consumer received no notice of the arbitration. (AG Compl. ¶¶ 40, 45, 52, 56, 61(c), 63, 81, 105(jj)(1)).

As noted, on March 12, 2007, based upon these and other allegations, the Attorney General instituted *BlueHippo I* against defendants and one of their principals, Joseph K. Rensin, in the Circuit Court of Kanawha County. He alleged the following claims:

Count 1: Acting as a telemarketer without first registering with the Department of Tax and Revenue in violation of West Virginia Code sections 46A–6F–301(a) and 46A–6–104 (*Id.* ¶¶ 125–26).

Count 2: Acting as a telemarketer without filing a bond with the Department of Tax and Revenue in violation of 46A–6F–301(a) and 46A–6–104 (*Id.* ¶¶ 130–31).

Count 3: Taking payment from consumer accounts before clearly and conspicuously disclosing all material aspects of the transaction in violation of numerous stated provisions of the West Virginia Code (*Id.* ¶¶ 136–45).

Count 4: Refusing to restore payment to consumers within 30 days of cancellation in violation of West Virginia Code sections 46A–6F–402 and 46A–6–104 (*Id.* ¶¶ 148–49).

Count 5: Misrepresenting and omitting material facts concerning the transactions with consumers in violation of West Virginia Code sections 46A–6–102(7)(M), 46A–6F–501(8), 46A–6–104, and 46A–6F–101 *et seq.* (*Id.* ¶¶ 154–66, 169).

Count 6: False advertising of goods and services in violation of West Virginia Code sections 46A–6–102(7)(N), 46A–6–104, and 46A–6F–101 *et seq.* (*Id.* ¶¶ 172–74).

Count 7: Misrepresenting the quality of goods and services in violation of West Virginia Code sections 46A–6–102(7)(G), 46A–6–104, and 46A–6F–101 *et seq.* (*Id.* ¶ 178).

Count 8: Creating a likelihood of confusion or misunderstanding in violation of West Virginia Code sections 46A–6–102(7)(L), 46A–6–104, and 46A–6F–101 *et seq.* (*Id.* ¶ 182).

Count 9: Misrepresenting that BlueHippo has special affiliations with computer manufacturers in violation of West Virginia Code sections 46A–6–102(7)(E), 46A–6–104, and 46A–6F–101 *et seq.* (*Id.* ¶ 188).

Count 10: Failing to provide written periodic receipts and statements of account in violation of West Virginia Code sections 46A–2–114(2), 46A–1–107, 46A–6F–501(8) 46A–6–104, and 46A–6F–101 *et seq.* (*Id.* ¶¶ 195–97).

Count 11: Charging unlawful penalties upon default in violation of West Virginia Code sections 46A–2–115, 46A–1–107, 46A–6F–501(8), 46A–6–104, and 46A–6F–101 *et seq.* (*Id.* ¶¶ 201, 208–09).

Count 12: Charging late fees that exceed the maximum excess charges allowed in violation of West Virginia Code sections 46A–7–111(1), 46A–6F–501(8), 46A–6–104, and 46A–6F–101 *et seq.* (*Id.* ¶¶ 216–17).

Count 13: Using unfair or unconscionable means of debt collection in violation of West Virginia Code sections 46A–2–128(c), 46A–2–128(d), 46A–6F–501(8), 46A–6–104, and 46A–6F–101 *et seq.* (*Id.* ¶¶ 223–25).

Count 14: Unlawfully accelerating a debt in violation of West Virginia Code sections 46A–2–106, 46A–6F–501(8), 46A–6–104, and 46A–6F–101 *et seq.* (*Id.* ¶¶ 228–29).[7]

Count 15: Using fraudulent, deceptive, or misleading representations in debt collection in violation of West Virginia Code sections 46A–2–127(d), 46A–2–127(g), 46A–6F–501(8), 46A–6–104, and 46A–6F–101 *et seq.* (*Id.* ¶¶ 236–39).

Count 16: Participating in unconscionable agreements and conduct in violation of West Virginia Code sections 46A–2–121, 46A–7–109 (1)(a)-(c), 46A–6F–501 (8), 46A–6–104, and 46A–6F–101 *et seq.* (*Id.* ¶¶ 241–44).

Count 17: Making or collecting excess charges in violation of West Virginia Code sections 46A–7–111 (*Id.* ¶ 246).

Count 18: Using unfair or unconscionable means of debt collection in violation of West Virginia Code sections 46A–2–128, 46A–6F–501(8), 46A–6– 104, and 46A–6F–101 *et seq.* (*Id.* ¶¶ 257–58).

On April 4, 2007, BlueHippo removed and answered in *BlueHippo I*, asserting "the [*BlueHippo I* ] Complaint alleges federal questions." (Not. of Remov. ¶ 6). BlueHippo did not allege federal subject matter jurisdiction respecting any of the allegations found in Counts 1–18 of the *BlueHippo I* complaint, inasmuch as those claims appeared to arise solely from state law and not "under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331; *see also id.* § 1441(a). Defendants relied instead for removal jurisdiction upon the following, discrete components of the *BlueHippo I* complaint's 19 separate requests in its prayer for relief:

A. That this Court schedule a hearing on its petition for preliminary injunction and enter an order that:

. . . .

(3) Temporarily restrains the defendants/respondents from entering any arbitration awards as judgments in any state *or federal court* as to transactions involving West Virginia consumers.

(4) Temporarily restrains the defendants/respondents from using any state *or federal court* to enforce [sic] collect debts or enforce any other obligations arising from transactions involving West Virginia consumers.

. . . .

K. An Order further setting forth that the civil penalties shall be deemed to be the result of an enforcement action brought pursuant to the Attorney General's police or regulatory powers under the West Virginia Consumer Credit and

---

**7.** This claim is mis-labeled in the *BlueHippo I* complaint as the "SIXTEENTH CAUSE OF ACTION." (*Id.* at 42).

Protection Act, W. Va.Code § 46A–1–101, *et seq. and are therefore nondischargeable in bankruptcy pursuant to 11 U.S.C. § 523(a)(7). See U.S. Dep't of Housing & Urban Development v. Cost Control Marketing & Sales Management of Virginia,* 64 F.3d 920 (1995); *Board of Governors of the Federal Reserve System v. MCorp Financial,* 502 U.S. 32 [112 S.Ct. 459, 116 L.Ed.2d 358] (1991)....

(*Id.* prayer for relief at A.3, A.4, and K.)[8] (emphasis supplied).

On June 25, 2007, *BlueHippo II* was instituted here. The six-count *BlueHippo II* complaint sought a declaration that certain provisions in the Telemarketing Article, relied upon heavily by the Attorney General in *BlueHippo I*, violated the First Amendment, the Fourteenth Amendment's Equal Protection Clause, and the Commerce Clause. (Compl. ¶¶ 1–2).

On July 23, 2007, the court remanded *BlueHippo I* to the circuit court based upon the absence of a federal question. On July 27, 2007, the circuit court in *BlueHippo I* held an evidentiary hearing respecting the Attorney General's motion for a preliminary injunction against BlueHippo, which presumably mirrored the "Temporary Relief" sought in the *BlueHippo I* complaint. (AG Compl. at 48 (aforementioned complaint stating "That this Court schedule a hearing on its petition for preliminary injunction and enter an order that" grants the "Temporary Relief" requested)). That same day, the circuit court entered an "Agreed Order" stating pertinently as follows:

[The parties] appeared for hearing on the State's previously filed Petition for Preliminary Injunction.... The State offered the testimony of ... [certain witnesses]....

Counsel thereafter advised the Court that prior to the hearing, as requested by the Court, the parties had attempted to reach a mutually agreeable resolution concerning the State's Petition, but had been unable to do so. Following further discussions during an adjournment of the hearing, the parties advised the Court *that they reached agreement on all but two issues. The Court's rulings with respect to those two issues are set forth below.*

\* \* \*

The Court has reviewed the parties' agreement, and has determined that good cause exists to accept it. The terms of the parties' agreement are as follows:

1. BlueHippo agrees that it will not enter into new transactions with West Virginia consumers. The State agrees that BlueHippo will continue to receive funds from West Virginia consumers with active open accounts, and may communicate with those consumers concerning their transactions.

2. BlueHippo agrees to establish an escrow account in West Virginia, into which funds received from active open accounts for West Virginia consumers will be deposited no less frequently than every two weeks....

---

8. The "PRAYER" found on pages 48–52 of the *BlueHippo I* complaint is broken up into two separate bold and centered headings entitled "Temporary Relief" and "Permanent Relief." (*Id.* at 48–49). Sections A.3 and A.4 above appear under the heading "Temporary Relief." Also found under the heading "Temporary Relief" are requests that BlueHippo be

"[t]emporarily restrain[ed]" from seeking access to state or federal courts to enforce the obligations owed to it by West Virginia consumers. These same requests for relief nowhere appear in the second section of the "PRAYER" entitled "Permanent Relief." (*Id.* at 49–52).

3. Before filing or otherwise proceeding with any action in state court, federal court, or an arbitration forum, to attempt to enforce obligations or recording any judgments arising from a transaction with a West Virginia consumer, BlueHippo agrees to provide the State with written notice of its intent to proceed. The State must notify BlueHippo of any objection, in writing, within 14 days of receipt of BlueHippo's notice. If the State does not do so, BlueHippo may proceed. If the State so objects, the parties shall present the matter to the Court for prompt resolution....

(Agd. Ord. at 1–2) (emphasis supplied).

The two issues upon which the parties could not reach agreement dealt with the Attorney General's demands (1) for BlueHippo's West Virginia customer information, and (2) that BlueHippo post a bond in the amount of $200,000. Respecting the first issue, the circuit court ordered BlueHippo to provide at least some of the information sought by the Attorney General. The circuit court deferred its ruling on the second issue after concluding the record was inadequate and the matter required further study.

On October 25, 2007, 2007 WL 6216559, the court granted in part the Attorney General's motion to dismiss *BlueHippo II*. In sum, Counts I, II, IV, and V, namely, the First Amendment and Fourteenth Amendment Equal Protection claims, were dismissed in deference to the ongoing state proceeding in *BlueHippo I*. The Commerce Clause claims, namely, counts III and VI, were retained for further development and disposition. Counsel have advised the court that the circuit court has stayed further action in *BlueHippo I* pending the outcome of *BlueHippo II*.

BlueHippo contends that its activities are wholly interstate in nature, that it lacks a physical presence in the West Virginia, and that West Virginia consequently lacks authority (1) to impose the Telemarketing Article's registration and security requirements upon it, or (2) to deny BlueHippo access to West Virginia courts and/or refuse to honor or enforce BlueHippo's contracts in interstate commerce. It seeks an order (1) declaring that application of the registration and security requirements of the Telemarketing Article to BlueHippo constitutes an undue burden on interstate commerce in violation of the Dormant Commerce Clause, and (2) enjoining defendants from enforcing or attempting to enforce those provisions against BlueHippo. (Compl. ¶¶ 69, 104, prayer at C. and F.).

## II.

### A. Summary Judgment Standard

A party is entitled to summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Material facts are those necessary to establish the elements of a party's cause of action. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

A genuine issue of material fact exists if, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-movant. *Id.* The moving party has the burden of showing—"that is, pointing out to the district court—that there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the movant satisfies this burden, then the non-movant must set forth specific facts as would be admissible in evidence that demonstrate the existence of a genuine issue of fact for trial. Fed.R.Civ.P. 56(c); *id.* at 322–23,

106 S.Ct. 2548. A party is entitled to summary judgment if the record as a whole could not lead a rational trier of fact to find in favor of the non-movant. *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir.1991).

Conversely, summary judgment is inappropriate if the evidence is sufficient for a reasonable fact-finder to return a verdict in favor of the non-moving party. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. Even if there is no dispute as to the evidentiary facts, summary judgment is also not appropriate where the ultimate factual conclusions to be drawn are in dispute. *Overstreet v. Ky. Cent. Life Ins. Co.*, 950 F.2d 931, 937 (4th Cir.1991).

A court must neither resolve disputed facts nor weigh the evidence, *Russell v. Microdyne Corp.*, 65 F.3d 1229, 1239 (4th Cir.1995), nor make determinations of credibility. *Sosebee v. Murphy*, 797 F.2d 179, 182 (4th Cir.1986). Rather, the party opposing the motion is entitled to have his or her version of the facts accepted as true and, moreover, to have all internal conflicts resolved in his or her favor. *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir.1979). Inferences that are "drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962).

B. Dormant Commerce Clause Analysis

The Commerce Clause authorizes Congress "[t]o regulate Commerce with foreign Nations, and among the several States." U.S. Const. art. I, § 8, cl. 3. The Clause does not explicitly limit the states insofar as commerce regulation is concerned. It has, however, been routinely interpreted as implicitly so restraining state authority in that area even where no federal statute covers the regulated subject. *See United Haulers Ass'n, Inc. v. Oneida–Herkimer Solid Waste Mgt. Auth.*, 550 U.S. 330, 127 S.Ct. 1786, 1792–93, 167 L.Ed.2d 655 (2007); *Case of the State Freight Tax*, 15 Wall. 232, 279, 21 L.Ed. 146 (1873); *Cooley v. Board of Wardens of Port of Philadelphia ex rel. Soc. for Relief of Distressed Pilots*, 12 How. 299, 318, 13 L.Ed. 996 (1852). This "negative" component of Article I, section 8, clause 3 is commonly known as the Dormant Commerce Clause.

As discussed further *infra*, the parties disagree somewhat concerning the standard to be applied to the Telemarketing Article to determine if it survives Dormant Commerce Clause scrutiny. In recent decades, however, the Supreme Court appears to have settled on a dual analysis consisting of *per se* invalidity for a narrow class of state commerce regulations and a balancing test for the remainder:

Under the resulting protocol for dormant Commerce Clause analysis, we ask whether a challenged law discriminates against interstate commerce. *See Oregon Waste Systems, Inc. v. Department of Environmental Quality of Ore.*, 511 U.S. 93, 99, 114 S.Ct. 1345, 128 L.Ed.2d 13 (1994). A discriminatory law is "virtually per se invalid," *ibid.*; *see also Philadelphia v. New Jersey*, 437 U.S. 617, 624, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978), and will survive only if it "advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives," *Oregon Waste Systems, supra*, at 101, 114 S.Ct. 1345 (internal quotation marks omitted); *see also Maine v. Taylor*, 477 U.S. 131, 138, 106 S.Ct. 2440, 91 L.Ed.2d 110 (1986). Absent discrimination for the forbidden purpose, however, the law "will be upheld unless the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970). State laws fre-

quently survive this *Pike* scrutiny, *see, e.g., United Haulers Assn., Inc. v. Oneida–Herkimer Solid Waste Management Authority,* 550 U.S. 330, 345–348, 127 S.Ct. 1786, 1797–98, 167 L.Ed.2d 655 (2007) (plurality opinion); *Northwest Central Pipeline Corp. v. State Corporation Comm'n of Kan.,* 489 U.S. 493, 525–526, 109 S.Ct. 1262, 103 L.Ed.2d 509 (1989); and *Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. 456, 472–474, 101 S.Ct. 715, 66 L.Ed.2d 659 (1981); though not always, as in *Pike* itself, 397 U.S., at 146, 90 S.Ct. 844.

*Department of Revenue of Ky. v. Davis,* —— U.S. ——, 128 S.Ct. 1801, 1808–09, 170 L.Ed.2d 685 (2008).

Consistent with this approach, our court of appeals conducts Dormant Commerce Clause analyses using two tiers. The first is referred to as the "discrimination" tier and the second as the "undue burden" tier. *Yamaha Motor Corp., U.S.A. v. Jim's Motorcycle, Inc.,* 401 F.3d 560, 567 (4th Cir. 2005); *Environmental Tech. Council v. Sierra Club,* 98 F.3d 774, 785 (4th Cir.1996).

### 1. The Discrimination Tier

■■■ "The clearest example of a state law that violates the Dormant Commerce Clause is one that facially discriminates against interstate commerce, such as a protective tariff or customs duty." *DIRECTV, Inc. v. Tolson,* 513 F.3d 119, 122 (4th Cir.2008) (citing *West Lynn Creamery, Inc. v. Healy,* 512 U.S. 186, 193, 114 S.Ct. 2205, 129 L.Ed.2d 157 (1994); *see*

*also Brown–Forman Distillers Corp. v. New York State Liquor Auth.,* 476 U.S. 573, 579, 106 S.Ct. 2080, 90 L.Ed.2d 552 (1986)). In sum, states are prohibited from imposing commerce regulations that apply " 'differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter.' " *Beskind v. Easley,* 325 F.3d 506, 514 (4th Cir.2003) (quoting *Oregon Waste Systems, Inc. v. Dep't of Environmental Quality,* 511 U.S. 93, 99, 114 S.Ct. 1345, 128 L.Ed.2d 13 (1994)).

■■■ The strict scrutiny applied under the discrimination tier, however, is not limited to situations involving disparate treatment of in- and out-of-state interests. In this circuit, the rule of virtual *per se* invalidity used within the discrimination tier extends beyond discriminatory laws and reaches as well those state laws that operate extraterritorially. *Carolina Trucks & Equipment, Inc. v. Volvo Trucks of North America, Inc.,* 492 F.3d 484, 492 (4th Cir. 2007) ("The Supreme Court has written that 'there is no clear line' separating state laws that are 'virtually per se invalid under the Commerce Clause,' *including those with forbidden extraterritorial reach* . . . .")(emphasis supplied). A prohibited extraterritorial law is one in which the " 'practical effect of the regulation is to control conduct beyond the boundaries of the State.' " *Volvo,* 492 F.3d at 489 (quoting *Healy v. Beer Inst.,* 491 U.S. 324, 336, 109 S.Ct. 2491, 105 L.Ed.2d 275 (1989)).[9]

---

**9.** The *Volvo* case explained the rationale behind the rule prohibiting extraterritorial regulation:

> The principle that state laws may not generally operate extraterritorially is one of constitutional magnitude. One state may not "project its legislation" into another, as the Commerce Clause "precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State," *Healy,* 491 U.S. at

335, 109 S.Ct. 2491 (quoting *Edgar v. MITE Corp.,* 457 U.S. 624, 642–43, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982) (plurality opinion)); *see also Bigelow v. Virginia,* 421 U.S. 809, 822–23, 95 S.Ct. 2222, 44 L.Ed.2d 600 (1975) ("The Virginia Legislature could not have regulated the advertiser's activity in New York, and obviously could not have proscribed the activity in that State.").

*Volvo,* 492 F.3d at 489–90 (some citations omitted).

■ Regarding discrimination, it appears clear that the Telemarketing Article bears none of the hallmarks of prohibited economic protectionism, either in its practical effect or purpose. Regarding the doctrine of extraterritorial effects, the Telemarketing Article appears confined to the regulation of conduct occurring within this state. To the extent BlueHippo contends otherwise, the argument fails, as observed by the United States Court of Appeals for the First Circuit in an analogous setting:

Under the [challenged act of the Maine legislature] ..., a transaction outside of Maine between two parties ... can take place regardless of whether Maine consents or not. Maine law does not "regulate ... [the] out-of-state transaction, either by its express terms or by its inevitable effect." Maine does not dictate the terms of such a transaction. Nor is Maine in any way "project[ing] its legislation" into those other states. It simply requires that ... [the challenging entities], should they choose to do business within Maine, provide "covered entities" with certain information about their business relationships. In other words, the UPDPA does not require out-of-state commerce to be conducted according to in-state terms. It requires only that in-state commerce be conducted according to in-state terms.... In light of this distinction, we think that the UPDPA cannot properly be said to have an extraterritorial reach violating the Commerce Clause.

*Pharmaceutical Care Mgt. Ass'n v. Rowe,* 429 F.3d 294, 312 (1st Cir.2005) (citations omitted). The Telemarketing Article passes first-tier scrutiny.

### 2. The Undue Burden Tier

■ Moving to the undue burden tier, a state statute that does not discriminate against interstate commerce may still be struck down if "the burden imposed on ... commerce is clearly excessive in relation to the putative local benefits. If a legitimate local purpose is found, then the question becomes one of degree." *Yamaha,* 401 F.3d at 569 (quoting *Pike,* 397 U.S. at 142, 90 S.Ct. 844 (internal citation omitted)); *see also General Motors Corp. v. Tracy,* 519 U.S. 278, 287, 117 S.Ct. 811, 136 L.Ed.2d 761 (1997). According to *Pike,* "the extent of the burden that will be tolerated ... depend[s] on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities." *Yamaha,* 401 F.3d at 569 (quoting *Pike,* 397 U.S. at 142, 90 S.Ct. 844). Deference to the state legislature is an important component of the analysis:

In determining whether a statute has "a legitimate local purpose" and "putative local benefits," a court must proceed with deference to the state legislature. Courts "are not inclined to second-guess the empirical judgments of lawmakers concerning the utility of legislation." Thus, we consider whether the legislature had a rational basis for believing there was a legitimate purpose that would be advanced by the statute. We likewise apply a deferential standard in identifying a statute's putative benefits.

*Id.* (citations omitted) (stating as well "when local economic interests are affected, "[n]ondiscriminatory measures ... are generally upheld, in spite of [some burden] on interstate commerce, in part because the existence of major in-state interests adversely affected is a powerful safeguard against legislative abuse." ") (citations omitted).

■ In this action, the first part of the undue burden tier—determining whether the Telemarketing Article serves a legitimate local purpose—is informed by a variety of sources. The Telemarketing Article falls within the Act. It is thus appropriate to consider the general purposes of the Act

in determining the salutary ends sought to be achieved by the Telemarketing Article:

> The legislature hereby declares that the purpose of this article is to complement the body of federal law governing unfair competition and unfair, deceptive and fraudulent acts or practices in order to protect the public and foster fair and honest competition. . . .

W. Va.Code § 46A–6–101(1).

The need for legislative action respecting telemarketing in this state seems apparent, as it was to Congress in 1994 with the enactment of the Telemarketing and Consumer Fraud and Abuse Prevention Act ("TCFAPA"), 15 U.S.C. § 6101 *et seq.* The congressional findings supporting the TCFAPA provide as follows:

> (1) Telemarketing differs from other sales activities in that it can be carried out by sellers across State lines without direct contact with the consumer. Telemarketers also can be very mobile, easily moving from State to State.
>
> (2) Interstate telemarketing fraud has become a problem of such magnitude that the resources of the Federal Trade Commission are not sufficient to ensure adequate consumer protection from such fraud.
>
> (3) Consumers and others are estimated to lose $40 billion a year in telemarketing fraud.

> (4) Consumers are victimized by other forms of telemarketing deception and abuse.
>
> (5) Consequently, Congress should enact legislation that will offer consumers necessary protection from telemarketing deception and abuse.

15 U.S.C. § 6101. The Supreme Court has likewise recognized it is in the public interest to curtail fraudulent solicitations. *See Village of Schaumburg v. Citizens for a Better Environment,* 444 U.S. 620, 637, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980).

Additionally, the following observation by the Attorney General is left essentially unchallenged:

> Fifty states have passed telemarketing statutes similar to that of West Virginia's. Most of these statutes, if not all, require both registration and bonding of telemarketers. At least 18 of these state statutes cover inbound, as well as outbound, telemarketing call schemes.

(AG's Memo. in Supp. at 13)(citing statutory provisions). Based upon the foregoing, it is apparent that the Telemarketing Article serves a legitimate local purpose.[10]

In counterbalance, the court next considers the extent of the burden imposed on interstate commerce by the registration and security provisions. Regarding registration, an applicant must apply at least 60 days prior to offering goods or services in the state and then reapply each year

---

**10.** BlueHippo attempts to diminish the legitimate local purposes of the Telemarketing Article. It asserts, *inter alia,* that the registration and bonding requirements are not vigorously enforced. It further observes that defaulting telemarketers are pursued civilly only after the Attorney General (1) receives a consumer complaint, *and* (2) another statute in addition to the Telemarketing Article has been violated.

These contentions support alternative inferences as well. First, if fraud prevention is a primary purpose of the Telemarketing Article,

it is reasonable for the state to await some indication of fraud through a consumer complaint prior to corralling the offender. This is especially so given limited resources for consumer protection efforts. The Consumer Protection Division addressed over 10,000 complaints last year with a staff of six lawyers and three paralegals. Second, the Attorney General's willingness to delay enforcement action pending some indication of fraud demonstrates a further measure of solicitude for the free flow of commerce between the states.

thereafter. 46A–6F–301(b). The application for registration must include the following information relating to the applicant:

(1) The true name, addresses, telephone number, and any names under which it intends to telemarket;

(2) Each occupation or business of the applicant's principal owner for the preceding two years;

(3) Certain criminal or civil enforcement history relating to any principal or manager;

(4) Civil or administrative actions for claims relating to certain dishonest business practices;

(5) Any history in the preceding seven years of bankruptcy or reorganization due to insolvency;

(6) The name, home address, birth date, social security number and all other names of management personnel,

(7) The name, address, and account number of institutions used for banking and financial transactions.

*Id.* § 46–6F–301(c).

According to the Attorney General, the information required by (1), (2) and (6) above is designed to prevent a "rip and tear" scheme, namely, a dodge involving a transient, anonymous fraud in which the perpetrator moves to and from various locations after having misled consumers. *See United States v. Brown,* 147 F.3d 477, 484 (6th Cir.1998)("From this information, ... and based on his four years of investigating telemarketing fraud, Burns concluded that Brown's SMD had all of the indicia of a 'rip and tear' operation whereby the person operating the business simply convinces people to send him money in exchange for some award or prize and never sends them anything. This kind of a business necessarily relies on anonymity, hence utilizing caller identification boxes, a fake social security number, and post office boxes.").

Requirements (3), (4), and (5) appropriately aim more careful scrutiny toward those with serious criminal or civil violations or indications of financial irresponsibility. Requirement (7), according to the Attorney General, "is obviously geared toward letting the state regulators know where the assets of the telemarketing business are located—both so as to check prior conduct and to assure regulators of the location of assets in the event of a need for property attachment." (AG Mem. in Supp. at 18).

The foregoing registration requirements, whether considered singly or collectively, pose no more than a minimal burden. The information is readily available to the applicant, and it is neatly tailored to alert the state sovereign to valid consumer protection concerns.

Regarding the security requirement, the Telemarketing Article mandates, *inter alia,* that a separate $100,000 bond be filed for each telemarketing location or a single bond for all locations in the amount of $500,000. W. Va.Code § 46A–6F–302(a). As noted, the bond must provide that "the telemarketer will pay all damages to the State or a private person resulting from any unlawful act or action by the telemarketer or its agent in connection with the conduct of telemarketing activities." *Id.* § 46A–6F–302(b). The bond must remain effective for three years after the telemarketer ceases business in the state. *Id.* § 46A–6F–302(d).

The evident purpose behind the security requirement is to provide some assurance that consumers who are harmed in this state by telemarketers will have a means of redress to compensate for their injuries.

Balancing the minimal and incidental burdens upon commerce imposed by the registration and security requirements against the quite legitimate and substan-

tial, consumer protection purposes that underlie them, the Telemarketing Article passes constitutional muster under *Pike* and its progeny. This is especially so in view of the well-settled reluctance to strike down a state statute using the undue burden tier. *See Yamaha,* 401 F.3d at 569; *SPGGC, LLC v. Blumenthal,* 505 F.3d 183, 194 (2nd Cir.2007)("And because consumer protection is a field traditionally subject to state regulation, '[w]e should be particularly hesitant to interfere with the [State's] efforts under the guise of the Commerce Clause.' ") (quoting *United Haulers Ass'n, Inc. v. Oneida–Herkimer Solid Waste Mgt. Auth.,* 550 U.S. 330, 127 S.Ct. 1786, 167 L.Ed.2d 655 (2007)).

While not addressed by the parties, one other consideration is noteworthy. The findings accompanying the federal TCFAPA include the observation that "[i]nterstate telemarketing fraud has become a problem of such magnitude that the resources of the Federal Trade Commission are not sufficient to ensure adequate consumer protection from such fraud." *Id.* § 6101(2). While the TCFAPA authorized the Federal Trade Commission to "prescribe rules prohibiting deceptive telemarketing acts or practices and other abusive telemarketing acts or practices[,]" considerable room seems to have been left for state enforcement efforts.

The TCFAPA authorizes state attorneys general to institute civil actions against persons violating Federal Trade Commission telemarketing rules. The TCFAPA additionally provides as follows:

(f) Actions by other State officials

(1) Nothing contained in this section shall prohibit an authorized State official from proceeding in State court on the basis of an alleged violation of any civil or criminal statute of such State.

(2) In addition to actions brought by an attorney general of a State under subsection (a) of this section, such an action may be brought by officers of such State who are authorized by the State to bring actions in such State on behalf of its residents.

*Id.* § 6103(f).[11] These carve outs are significant. *See Silver v. Woolf,* 694 F.2d 8, 13 (2nd Cir.1982) ("A state law which a federal court might invalidate where Congress is silent will ... be upheld where Congress has indicated its desire to allow states to act.") (citing *Prudential Insurance Co. v. Benjamin,* 328 U.S. 408, 66 S.Ct. 1142, 90 L.Ed. 1342 (1946)); *Parke, Davis & Co. v. Health Cross Stores, Inc.,* 364 F.2d 214, 216 (4th Cir.1966)("The plenary powers which the Congress derives from the Commerce Clause include the broad discretionary power to prohibit or to authorize state legislation regulating or affecting interstate commerce in designated areas or facets.").

### C. Other Arguments

BlueHippo lodges other arguments designed to upend the Telemarketing Article. The contentions involve a misreading of precedent and a mischaracterization of the state's civil enforcement effort in *BlueHip-*

---

**11.** The other federal foray of consequence is the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227. At least two provisions of the TCPA are worth mention. The first is found in section 227(e)(1)(D):

[N]othing in this section or in the regulations prescribed under this section shall preempt any State law that imposes more restrictive intrastate requirements or regulations on, or which prohibits—

. . . .

(D) the making of telephone solicitations. *Id.* § 227(e)(1)(D). The second provision is found in section 227(f)(6), as follows: "Nothing contained in this subsection shall be construed to prohibit an authorized State official from proceeding in State court on the basis of an alleged violation of any general civil or criminal statute of such State." *Id.* § 227(f)(6).

*po I.* Regarding precedent, BlueHippo contends that the defendants are attempting, through the Telemarketing Article, to unlawfully exercise control over BlueHippo's purely interstate business. Specifically, BlueHippo contends that the Attorney General denying it access to West Virginia consumers and courts and voiding its existing West Virginia contracts amount to "direct" burdens on interstate commerce prohibited by the Supreme Court.

The principal commentators appear to agree that the "direct" and "indirect" distinctions once frequently used in Dormant Commerce Clause jurisprudence have now largely been abandoned in favor of the two-tiered scheme discussed earlier. *See* 1 Laurence H. Tribe, *American Constitutional Law* § 6–5 (3d ed. 2000) ("In the years since the mid–1930s, the Court's analysis of state regulation of commerce has metamorphosed once again. The Supreme Court abandoned the distinction between 'direct' and 'indirect' burdens. The dichotomy was not only overly conclusory and misleadingly precise but also did not comport with the Court's post–1937 understanding of interstate commerce."); 2 Ronald D. Rotunda & John E. Nowak, *Treatise on Constitutional Law—Substance and Procedure* § 11.8 (3rd ed. 1999) (noting Justice Stone's landmark dissent in *Di Santo v. Pennsylvania,* 273 U.S. 34, 43, 47 S.Ct. 267, 71 L.Ed. 524 (1927), which led to the two-tiered approach, and observing that "[t]he Court now accepts its judicial role of balancing conflicting economic policies until such time as Congress chooses to act."); *see also id.* § 11.7(d) ("Commentators on the various problems and court tests in this area abound, but perhaps the best summary of the law in this area is by the Supreme Court itself in *Pike* . . . .") (footnote omitted); Kathleen M. Sullivan & Gerald Gunther, *Constitutional Law* (16th ed. 2007) (noting Justice Stone's proposed balancing scheme in *Di Santo* "anticipated the modern Court's approach" and noting

further that in the modern era "Dormant Commerce Clause decisions increasingly abandoned any attempt to apply categorical distinctions between . . . 'indirect' and 'direct' effects.").

BlueHippo also relies heavily upon two other lines of authority. The first is represented by *Allenberg Cotton Co., Inc. v. Pittman,* 419 U.S. 20, 95 S.Ct. 260, 42 L.Ed.2d 195 (1974). To the extent *Allenberg* is properly understood to establish a *per se* Dormant Commerce Clause analysis absent discrimination or extraterritorial effects, it is in tension, and out of sync, with modern Commerce Clause jurisprudence. *See* Jeremy T. Rosenblum & Keith S. Marlowe, *Commerce Clause Limitations on State Laws Affecting Interstate Lending Programs,* 50 Consumer Fin. L.Q. Rep. 86, 88 (1996) ("At present, it is difficult to predict whether (and how) *Pike* and *Allenberg Cotton* will be reconciled by the courts. . . . Perhaps *Allenberg* will survive as a special rule for door closing statutes; perhaps it will be overruled in the future. In any event, standing alone it represents too weak a precedent to support an interstate lender's determination to ignore foreign state qualification or licensing laws.").

The observation is not diminished by *Bendix Autolite Corp. v. Midwesco Enterprises, Inc.,* 486 U.S. 888, 108 S.Ct. 2218, 100 L.Ed.2d 896 (1988), a more recent case cited by BlueHippo which references *Allenberg.* The decision in *Bendix* actually supports the views of the Attorney General and the Revenue Secretary, namely, that the two-tiered Dormant Commerce Clause analysis applies when a purely interstate trader challenges state regulation of its activities. *Bendix Autolite Corp. v. Midwesco Enterprises, Inc.,* 486 U.S. 888, 891, 108 S.Ct. 2218, 100 L.Ed.2d 896 (1988) ("Where the burden of a state regulation falls on interstate commerce, restricting its flow in a manner not applicable to local business and trade, there may be either a

discrimination that renders the regulation invalid without more, or cause to weigh and assess the State's putative interests against the interstate restraints to determine if the burden imposed is an unreasonable one.").

The second line of authority relied upon BlueHippo, the so-called "drummer" cases, is less persuasive. The decisions, beginning with *Robbins v. Shelby County Taxing District*, 120 U.S. 489, 7 S.Ct. 592, 30 L.Ed. 694 (1887), were handed down by the Supreme Court from the late 1800s through the mid–1900s.[12] *See Memphis Steam Laundry Cleaner v. Stone*, 342 U.S. 389, 392–393, 72 S.Ct. 424, 96 L.Ed. 436 (1952). As discussed earlier, much has transpired in Dormant Commerce Clause jurisprudence since that earlier era. The modern, two-tiered approach is deemed controlling given the importance of the state interests served and the very minimal associated burdens on commerce. *See Aldens, Inc. v. LaFollette*, 552 F.2d 745, 753 (7th Cir.1977) (action challenging Wisconsin consumer protection law, in which plaintiff asserted it was "the quintessential interstate trader with no objective manifestation of itself extant within Wisconsin[,]" and court of appeals observing that "the case now before us is an exercise of the police power. As such it is inappropriate to treat it on a *per se* basis. Rather, a balancing test is in order. Since the Wisconsin Consumer Act has already been shown not to be an undue burden on interstate commerce under a balancing analysis ... the Act is, therefore, constitutional.") (citations omitted); *see also Aldens, Inc. v. Packel*, 524 F.2d 38, 50 (3rd Cir.1975).

Regarding the mischaracterization of the state's civil enforcement efforts against it, BlueHippo misstates the scope and posture of the *BlueHippo I* complaint along with the law applicable. (*See, e.g.*, Pls.' Resp. to Def. Helton's Memo. in Supp. at 1–2) ("BlueHippo asserts that the State ... unduly burdens interstate commerce when ... [it] attempts to deny BlueHippo access to West Virginia courts and/or refuses to honor or enforce BlueHippo's contracts made for interstate commerce simply because BlueHippo has not registered as a telemarketer or posted security."). It is noteworthy that the Telemarketing Article nowhere makes (1) access to West Virginia courts, or (2) court enforcement of BlueHippo's contracts contingent upon satisfaction of the registration and bonding requirements.[13]

Additionally, the circuit court action has changed significantly since its inception.

---

**12.** The "drummer" name is derived from the facts of the cases, which often involved discrimination against non-resident traveling salespersons seeking to drum-up business for their out-of-state principals.

**13.** The Telemarketing Article's registration and security requirements appear in line with circuit precedent. In *Underhill Associates, Inc. v. Bradshaw*, 674 F.2d 293 (4th Cir.1982), the court of appeals addressed a Dormant Commerce Clause challenge to the Virginia Securities Act ("VSA"). The VSA made it unlawful for brokers and dealers to transact business in the state prior to registering to do business there and paying an application fee. In upholding the statute, the court of appeals observed that "The Virginia statute applies evenly to both local and foreign broker-dealers and the only burden on interstate commerce is the requirement that all broker-dealers register and pay an annual fee...." *Id.* at 295. The court of appeals additionally noted that "Virginia's interest in protecting its citizens from possibly dishonest or incompetent securities dealers is obvious." *Id.*

The decision in *Underhill* is noteworthy for an additional reason. The defendant broker-dealers in that action, like BlueHippo here, lacked offices, salesmen, or representatives in Virginia. Instead, they made extensive use of the mails, telephone, and advertising to contract business and held "themselves out as being available to do business with anyone, anywhere." *Id.* They depended upon potential customers to contact them by toll-free telephone numbers. The court of appeals nevertheless used the *Pike* balancing scheme

The *BlueHippo* complaint sought originally to force BlueHippo to post a $200,000 bond, to divulge its West Virginia customer list, and, with respect to West Virginians, to *temporarily* restrict BlueHippo from: (1) selling to or contacting them; (2) engaging in collection efforts relating to them; or (3) using arbitration mechanisms, state courts, or federal courts to collect debts or enforce obligations owed to Blue-Hippo by them.

These requests for "temporary relief[,]" however, were resolved either by the mutual agreement of the parties in the circuit court or that tribunal's unappealed July 27, 2007, order. It is thus uncertain whether any of them are now sufficiently controverted to justify the constitutional challenge it has lodged here.

More importantly, however, both the "Temporary Relief" and "Permanent Relief" sought by the Attorney General is requested not only on the basis of Blue-Hippo's failure to comply with the registration and security requirements of the Telemarketing Article. Rather, it is based upon other, independent alleged violations of the Act which must first be adjudicated through a "final hearing" on the merits, with the requested relief being considered thereafter. (*See* A.G. Compl. at 49). The independent alleged violations include (1) taking consumer payments before disclosing all material aspects of the transaction; (2) refusing to restore payment to consumers within 30 days of cancellation; (3) misrepresenting and omitting a host of material facts concerning consumer transaction; (4) false advertising of goods and services;

(5) misrepresenting the quality of goods and services; (6) creating a likelihood of confusion or misunderstanding; (7) misrepresenting that BlueHippo has special affiliations with computer manufacturers; (8) failing to provide written periodic receipts and statements of account; (9) charging unlawful penalties upon default; (10) charging late fees that exceed the maximum excess charges allowed; (11) using unfair or unconscionable means of debt collection; (12) unlawfully accelerating a debt; (13) using fraudulent, deceptive, or misleading representations in debt collection; (14) participating in unconscionable agreements and conduct; (15) making or collecting excess charges; and (16) using unfair or unconscionable means of debt collection. BlueHippo does not suggest that a state sovereign is prohibited from seeking appropriate injunctive relief to halt these types of alleged unfair methods of competition or unfair or deceptive acts or practices. The circuit court may never need to reach the question of a remedy for BlueHippo's failure to comply with the registration and security requirements.

In any event, *BlueHippo I* is about much more than those often facially discriminatory practices outlawed over a century ago in the drummer cases. Instead, the underlying conduct at the time *Blue-Hippo I* was filed involved a host of alleged deceptive and unfair trade practices of an ongoing nature. Our circuit's two-tiered approach appears to be the best framework under these circumstances for resolving a Dormant Commerce Clause challenge.[14] *See Omega World Travel,*

---

to test the VSA rather than a *per se* rule governing purely interstate businesses.

**14.** Additionally, BlueHippo offers no Dormant Commerce Clause authority for a preemptive, collateral attack on a state circuit court that has yet to adjudicate and award relief on the purely state law claims before it. The principal cases cited by BlueHippo in-

volved statutes that explicitly closed the doors of the state courts to unregistered merchants, not a state court barring enforcement of contracts found to have been formed and enforced in a manner violative of state consumer protection statutes. *See, e.g., Allenberg,* 419 U.S. at 21, 95 S.Ct. 260; *Eli Lilly & Co. v. Sav–On–Drugs, Inc.,* 366 U.S. 276, 277, 81 S.Ct. 1316, 6 L.Ed.2d 288 (1961); *Dahnke–*

*Inc. v. Mummagraphics, Inc.*, 469 F.3d 348, 356 (4th Cir.2006) ("Whether a nondiscriminatory law unduly burdens interstate commerce turns upon whether it serves a 'legitimate local purpose,' and, if so, 'the nature of the local interest involved, and ... whether it could be promoted as well with a lesser impact on interstate activities.'") (quoting *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970)).

Based upon the foregoing analysis, the court ORDERS as follows:

1. That plaintiffs' motion for summary judgment be, and it hereby is, denied;

2. That defendants' motions for summary judgment be, and they hereby are, granted; and

3. That this action be, and it hereby is, dismissed and stricken from the docket.

The Clerk is directed to forward copies of this written opinion and order to all counsel of record.

### *JUDGMENT ORDER*

In accordance with the memorandum opinion and order entered this same day, it is ORDERED and ADJUDGED that the plaintiffs, BlueHippo Funding, LLC, and BlueHippo Capital, L.L.C., take nothing in the way of the declaratory and injunctive relief sought against the defendants, Darrell V. McGraw and Virgil T. Helton, in this action and that judgment be, and it hereby is, entered in favor of the defendants. It is further ORDERED that this

*Walker Milling Co. v. Bondurant*, 257 U.S. 282, 290, 42 S.Ct. 106, 66 L.Ed. 239 (1921); *Sioux Remedy Co. v. Cope*, 235 U.S. 197, 200, 35 S.Ct. 57, 59 L.Ed. 193 (1914); *International Text–Book Co. v. Pigg*, 217 U.S. 91, 104, 30 S.Ct. 481, 54 L.Ed. 678 (1910).

If BlueHippo is ultimately aggrieved by the scope of the relief awarded, if any, by the

action be, and it hereby is, dismissed with prejudice and stricken from the docket.

The Clerk is directed to forward copies of this order to all counsel of record.

circuit court, it may pursue its appellate remedies culminating in the United States Supreme Court. That is precisely the course taken by the offended merchants in *Allenberg, Eli Lilly, Dahnke–Walker, Sioux Remedy,* and *Pigg.*